819 So.2d 145 (2002)
MILLAR ELEVATOR SERVICE COMPANY, Appellant,
v.
Mary Jo McGOWAN, Janet Burke, Richard Burke, and Margaret Zamora, Appellees.
No. 2D01-1807.
District Court of Appeal of Florida, Second District.
April 5, 2002.
Rehearing Denied May 16, 2002.
*146 Harry K. Bender of Bender, Bender & Chandler, P.A., Coral Gables, and Raymond T. Elligett, Jr., of Schropp, Buell & Elligett, P.A., Tampa, for Appellant.
Michael J. Keane and Brandon S. Vesely of Keane, Reese & Vesely, P.A., St. Petersburg, and Justin C. Johnson, Paul Castagliola, and Michael J. Keane, St. Petersburg, for Appellees.
CASANUEVA, Judge.
Millar Elevator Service Company, the prevailing defendant in a personal injury lawsuit based on an alleged elevator malfunction on February 3, 1994, appeals an order granting the plaintiffs, Mary Jo McGowan, Janet Burke, Richard Burke, and Margaret Zamora,[1] a new trial. At *147 the trial that took place in December 2000, plaintiffs' counsel complained of prejudicial error because Millar's experts allegedly had surprised the plaintiffs at trial with expert testimony on causation that differed from the experts' deposition testimony. The trial court agreed with plaintiffs' counsel that this allegedly surprise expert testimony provided Millar with a new defense theory while correspondingly denying the plaintiffs an opportunity to address, refute, or rebut it. Millar argues that it was error to grant a new trial because plaintiffs' counsel neither objected to the surprise testimony when it was first presented nor timely sought a mistrial. We find merit in Millar's contentions and, accordingly, reverse the order for a new trial.
The plaintiffs claimed their injuries occurred as they were leaving work for the day when they were among eight persons who were riding down on the elevator in their six-story office building in Clearwater, Florida. Although each eyewitness's account varied somewhat, the plaintiffs' scenario of the incident generally was that after they boarded the elevator car on the fourth floor, it stopped at the third floor, but the person who had summoned it there could not board because the car was full. The car continued its descent but did not stop at the ground floor where, according to Ms. McGowan, the door opened between one and two inches and then closed. After bypassing the ground floor, it came to a hard stop and then went back up to the third floor where all the passengers exited and walked down the stairs. The plaintiffs theorized that the simultaneous failure of the elevators' three separate electromagnetic and mechanical switching systems caused the sudden stop that injured them, that Millar had improperly serviced and maintained the elevator and its systems, and that Millar's negligent maintenance allowed the systems to fail. In its defense, Millar presented the trial testimony of five witnesses, only three of whom are at issue here: Gary Mull, Millar's service supervisor in charge of the technicians who serviced this elevator, and two technical experts, William Smith and Charles Manning, Ph.D. Mr. Smith's expertise was based on a forty-year career in elevator construction, repair, inspection, and service; since retiring in 1987, he continued to consult in the elevator business. Dr. Manning's expertise was in accident reconstruction and the magnitude of the gravitational forces (G-forces) to which the plaintiffs would have been subjected if the elevator came to stop as suddenly as alleged.
Mr. Mull, who was also the corporate representative for Millar at trial, was not offered by Millar or qualified by the court as an elevator expert. He merely explained to the jury on direct examination the normal functioning of this type of hydraulic elevator; he also reviewed and explained the servicing that was performed on it several days before and on the day of the incident.[2] He stated that for the elevator to operate during the incident as the plaintiffs had described, the electromagnetic *148 and mechanical switching systems would have to have been working properly. On cross-examination, plaintiffs' counsel asked Mr. Mull whether he believed that some alleged construction dust and debris in the elevator shaft, supposedly resulting from remodeling of the building lobby, caused a mechanical switch spontaneously to open without being mechanically activated. Mr. Mull responded that that was his theory when he was deposed. Plaintiffs' counsel then asked: "I take it you have a new theory?" Mr. Mull responded affirmatively and upon further questioning merely explained that he believed that the elevator car did not "crash" onto the buffers[3] as the plaintiffs were claiming, but did just touch them. Other than this admission about the elevator car touching the buffers, there was no testimony from Mr. Mull about any type of malfunction that may have caused the incident. Despite eliciting from Mr. Mull that this was a "new" theory, plaintiffs' counsel at this point neither objected to this testimony, sought to have it stricken, sought an instruction, nor sought a mistrial. When the trial court allowed the jury to submit written questions to this witness, one juror asked what would happen to the elevator car if there were a leak in the hydraulic system. Plaintiffs' counsel had no objection to submitting this question to the witness. Mr. Mull then answered that, because the elevator car sits on a cushion of oil in the hydraulic chamber, if hydraulic fluid were leaking out, the elevator car would descend at the rate of the leak until it came to rest on the buffer springs.
After Mr. Mull's questioning by the jury was completed, Mr. Smith, Millar's primary expert, testified that Millar's maintenance of the elevator was not substandard. Even though there were inordinate numbers of service calls and callbacks on the electromagnetic and mechanical switches in the elevator shaft in the few days before the incident, even several on the day of the incident itself, every problem the service technicians came to repair was corrected. According to him, this was proven by the fact that the service technician returned the elevator to operation each time he was called to the building. Mr. Smith concluded there must have been some outside force causing these numerous service calls and callbacks, probably construction dust and debris in the shaft. This foreign matter in the elevator shaft could break the electromagnetic or mechanical connections, thus interrupting the electrical circuit and causing a stoppage or slow-down of the elevator. He explained that this elevator's top speed in descent, barring a catastrophic failure of the hydraulic system not present in this incident, was only two hundred feet per minute, which translated to 2.3 miles per hour. In trying to reconcile the varying descriptions of the incident from the eight passengers on board with the operation of the elevator, he said that most likely what occurred was that something, probably a small particle of construction debris, had caught in the valve that controlled the hydraulic oil's flow out of the cylinder and held the valve open. Thus, instead of the valve closing all the way to stop the outflow of hydraulic oil, and thus stopping the descent, this slow, continuous draining of the hydraulic fluid allowed the elevator car, which was riding on this slowly draining cushion of oil, to descend past the first floor until it stopped against the buffer. However, the elevator was still responsive to calls, because it then ascended *149 to the third floor in response to a summons there.[4]
When Mr. Smith first mentioned the stuck-open valve theory on direct examination, there was no objection from plaintiffs' counsel. After a few more questions on other topics and a thirteen-minute break in the proceedings, Millar's counsel had Mr. Smith clarify his theory by explaining that the electromagnetic and mechanical switches previously serviced that day had most likely worked properly during the incident but could not have stopped this hydraulically-caused descent past the first floor if the valve aperture were stuck open. There was still no objection from plaintiffs' counsel that this testimony was a surprise.
Instead, on cross-examination, plaintiffs' counsel managed to have Mr. Smith admit that, as he had previously stated in his deposition, he still thought it was construction dust and debris that were causing the service calls on the switches. Plaintiffs' counsel then asked: "Are you changing your opinions today from your deposition?" Mr. Smith answered: "Yes, I am." Plaintiffs' counsel then asked Mr. Smith whether, as an expert who had testified in court over a hundred times, he understood that the opinions the expert expresses in a deposition are supposed to be those the expert would express at trial. Mr. Smith agreed with him but explained that he had discovered different things about the elevator since the deposition. At this time, no objection to any alleged change in testimony was made, nor was there a request to strike the expert's testimony or for other relief.
Later in the cross-examination plaintiffs' counsel again brought up the subject of a change in testimony, asking Mr. Smith to confirm that his first mention of the elevator car hitting the buffer springs was at trial and not in his deposition. Mr. Smith agreed with this characterization by plaintiffs' counsel. Plaintiffs' counsel still offered no objection to any alleged surprise change in testimony. In attempting to impeach this witness, plaintiffs' counsel then tried to show how each passenger's description of the event could not be reconciled with Mr. Smith's "new" theory. Later, plaintiffs' counsel again asked if it was still Mr. Smith's theory that "this" was caused by construction debris. Mr. Smith, with the understanding that "this" referred to all the service callbacks on the switches, answered "yes." Throughout the cross-examination, plaintiffs' counsel referred to and questioned Mr. Smith on his alleged "new" theory.
When the jurors were permitted to submit written questions to this witness, plaintiffs' counsel had no objection to the following question being posed to Mr. Smith: "Would a repair, either mechanical or electrical, be needed to that particular system, either in the valve or the logic[5] before the elevator can function normally again?" Mr. Smith answered that, as far as the valve was concerned, once the elevator ascended again, i.e., because oil was now flowing into the hydraulic cylinder to raise *150 the elevator car, the movement of the oil through the valve and into the cylinder would self-clean the valve by flushing out the particle that previously had kept the valve from closing. This completed the evidence from Millar's first expert witness.
Millar had hired Dr. Manning as a second expert and asked him to review the accident, study the G-forces involved, and reconstruct the accident. At his deposition, he had stated that he conducted tests on both elevators, which were side by side in that building, because there was still confusion at that time about which elevator was involved in the incident. He informed plaintiffs' counsel at the deposition that he would testify at trial that the G-forces involved could not have caused the injuries of which the plaintiffs were complaining. He testified at trial immediately after Mr. Smith and described in detail the G-force tests he had conducted on both the leftside and right-side elevators. Millar's counsel guided Dr. Manning through a lengthy discussion of G-forces and critiques of the accident reconstruction done by the plaintiffs' expert, at which time plaintiffs' counsel objected to any further testimony asserting that G-forces were irrelevant in this negligence-only portion of the bifurcated trial. Millar's counsel, at that point, proffered Dr. Manning's final G-forces testimony. Dr. Manning's remaining direct examination testimony was that the elevator met all safety codes for G-forces in emergency stopping situations and could not have traveled at a rate of speed high enough, even as fast as the passengers described, to cause any injury to anyone in the car if it came to a sudden stop, whether it hit the buffers or not. At no time in Dr. Manning's direct examination was there mention of a hydraulic valve being stuck open.
During cross-examination and in response to a question posed by plaintiffs' counsel, Dr. Manning said that Ms. McGowan's description of the door opening one or two inches at the first floor before closing again, and then descending further until stopping abruptly, suggested to him that based on the design of this elevator, the descent speed at that point was much slower than what plaintiffs' expert had concluded. Plaintiffs' counsel then asked: "Whatever caused this event, was it a malfunction of the elevator?" Dr. Manning answered: "No. I think that something may have got in the valve to keep it open" but, upon further questioning, he refused to say whether it was construction debris in the valve. Plaintiffs' counsel then asked him whether the descriptions of the incident by the eight passengers suggested a malfunction. He answered affirmatively this time and said: "And my opinion is that none of thosenone of those three switches failed, that the valve was accidentally held open by something getting in it, and it didn't happen again." Plaintiffs' counsel at this point asked: "And this is a new theory today, isn't it, about the valve and something getting in it?" Dr. Manning responded that it was the first time that he learned the incident took place in the left-side elevator, and not the rightside one. Plaintiffs' counsel went over this ground again, with Dr. Manning maintaining that since his deposition three months earlier, he had come to realize that the incident happened in the left-side elevator, and not the right-side one.
Upon completing Dr. Manning's cross-examination, plaintiffs' counsel still made no complaint that he was surprised by anything in this witness's testimony. He surrendered the witness, and, further, had no objection to submitting this juror question to Dr. Manning: "If a valve failure is a possibility, why is there no backup to this but redundancy three-fold on the other scenarios [the switching systems]?" After Dr. Manning answered the juror *151 question,[6] plaintiffs' counsel tendered no objection, and, at this point, the trial concluded for the day.
The next morning before the jury returned to the courtroom, plaintiffs' counsel advised the trial court he was obligated to move for a mistrial because of the defense witnesses' diametrical change in testimony. Additionally, based on Ed Ricke & Sons, Inc. v. Green, 468 So.2d 908 (Fla.1985), plaintiffs' counsel requested that the court defer ruling on his mistrial motion until the jury returned its verdict. Plaintiffs' counsel further advised the court that if ruling were not reserved, he would withdraw his motion for mistrial.[7] The court took the motion under advisement. Millar then presented the remainder of its case. Subsequently, the jury was charged and, after deliberating, found no liability on Millar's part. The court granted the plaintiffs' motion for mistrial and ordered a new trial. It is this order that Millar appeals.
We review an order granting a motion for new trial under the abuse of discretion standard. Brown v. Estate of Stuckey, 749 So.2d 490, 497-98 (Fla.1999). In Ed Ricke, a seminal case in the context of a motion for mistrial, the supreme court discussed a trial court's discretion when it was resolving a conflict between the district courts of appeal about a trial court's reservation of ruling on a motion for mistrial until after the jury deliberates. The supreme court said:
[T]he trial court has the power to wait until the jury returns its verdict before ruling on a motion for mistrial. A motion for mistrial coupled with a request that the court reserve ruling until after the jury deliberates is simply a motion for a mistrial, and, if properly made, deserves full consideration at both the trial court and appellate levels.
Ed Ricke, 468 So.2d at 910. The supreme court enunciated in Ed Ricke two principles served by empowering a trial court to reserve ruling on a motion for mistrial: conserving judicial resources and preventing a wrongdoer from profiting from his or her own intentional misconduct.[8]Id. *152 When the prejudicial comments occur during closing argument, "it is quite reasonable for a trial judge to reserve ruling until after the jury deliberates in the hope that the jurors can rise above the alleged prejudice and cure the error." Id.
In the case before us, testimony describing a defense theory of causation, different from what plaintiffs' counsel was expecting, was first elicited during the direct examination of defense expert Mr. Smith, without objection by plaintiffs' counsel. Plaintiffs' counsel then picked up this ball and ran with it during his cross-examination of Mr. Smith, mentioning in his questioning of Mr. Smith for the first time that this was a "new" theory. Although we believe Millar's counsel should have alerted plaintiffs' counsel pretrial that its experts, particularly Mr. Smith, would express an opinion different from the one presented at deposition, plaintiffs' counsel waived this error and then proceeded to capitalize on the evidence by exploring it on cross-examination. While the mention of the stuck-open valve theory may have been surprising in Mr. Smith's testimony on direct examination, plaintiffs' counsel hammered on the issue during cross-examination and was the first to elicit it from Dr. Manning.[9] Dr. Manning had never mentioned a "new theory" of causation in his direct examination, or even any theory of causation. Plaintiffs' counsel's closing argument even utilized this "new theory" evidence by strongly urging the jurors to discredit the defense witnesses because of this perceived change in testimony.
Unlike Ed Ricke, where the objectionable comments were made during closing argument, 468 So.2d at 909, the objectionable testimony in this case occurred during the defense case-in-chief; moreover, plaintiffs' counsel did not express any objection to the evidence until the next day. Even if the first mention of the "new `stuck-open valve' theory" during the direct examination of defense expert Smith was a surprise, the exploration of that theory on cross-examination of Mr. Smith and Dr. Manning was confirmatory, not surprising. Yet, plaintiffs' counsel sought no contemporaneous protective and corrective action from the trial court.
In Padilla v. BIV Investments & Management, Inc., 783 So.2d 349 (Fla. 3d DCA 2001), BIV's motion for mistrial was made after the jury returned an unfavorable verdict. The Third District held that "BIV was not entitled to wait to see how the trial came out and then, upon being unsuccessful, move for a mistrial." Id. at 352. In Loyola v. Ricks, 777 So.2d 423 (Fla. 4th DCA 2000), the trial court reserved ruling on a motion for mistrial made on the first day of trial before any testimony was presented. The trial court granted the motion for mistrial after the six-day trial was completed. The Fourth District concluded that the trial court had abused its discretion *153 in ordering a new trial and observed that the delayed ruling on the mistrial did not serve the interests of judicial economy. Id. at 425. Padilla and Loyola are extreme examples of untimely motions for mistrial. This case falls between these two extremes.
Because plaintiffs' counsel made the motion for mistrial the day after the objectionable comments were made but before all the evidence was presented and the jury instructed, he attempted to conserve judicial resources, the first benefit expressed in Ed Ricke, and he argued as much at the time he made the motion. Although he made the motion for mistrial at a time arguably near the allegedly offensive comments, this does not answer the question whether the motion was timely so as to preserve the issue for review. We conclude that any error was waived because plaintiff's counsel made no contemporaneous objection.
To provide a trial court with the opportunity to correct errors, a timely objection is necessary. City of Orlando v. Birmingham, 539 So.2d 1133 (Fla.1989). This requirement also promotes judicial economy and prevents "a party from rolling the dice with the jury, confident that an unvoiced objection will garner a new trial if the verdict is unfavorable." Lowe Inv. Corp. v. Clemente, 685 So.2d 84, 85 (Fla. 2d DCA 1996) (citing Hargrove v. CSX Transp. Inc., 631 So.2d 345, 346 (Fla. 2d DCA 1994)). In Lowe Investment Corp., we warned:
Trial counsel simply cannot allow error to occur without objection, hope they will win in spite of the error, and be confident of a new trial when the trial court has not been afforded the opportunity to cure the error. The cases are legion that warn trial counsel they cannot have their cake and eat it too.
685 So.2d at 85. Here, plaintiffs' counsel repeatedly questioned defense witnesses about this allegedly surprising "new theory," never objected, never afforded the trial court a contemporaneous opportunity to correct the problem, and, in fact, attempted to use the "new theory" to plaintiffs' advantage by arguing it in closing. In sanctioning the improved procedure of a trial court's reservation of a ruling on a motion for mistrial until after the jury returns its verdict, the supreme court in Ed Ricke:
refuse[d] to change the general procedure that must be followed in order for a party to preserve a motion for a mistrial for appellate review. Unless the improper argument constitutes a fundamental error, a motion for a mistrial must be made "at the time the improper comment was made." Clark v. State, 363 So.2d 331 (Fla.1978).
Ed Ricke, 468 So.2d at 910. Plaintiffs' counsel rolled the dice here and came up short. The trial court abused its discretion in granting the motion for mistrial.
Finally, in the circumstances of this case, we further conclude that the unobjected-to mention by defense witnesses of a "new" theory since deposition did not rise to an error of fundamental dimension. Murphy v. Int'l Robotic Sys., Inc., 766 So.2d 1010 (Fla.2000).
We reverse the order granting a new trial and remand for entry of judgment on the jury's verdict in favor of Millar.
SALCINES and COVINGTON, JJ., Concur.
NOTES
[1] We recently clarified which parties the Florida Rules of Appellate Procedure require be appellees in this appeal. Millar Elevator Service Co. v. McGowan, 804 So.2d 1271 (Fla. 2d DCA 2002). Of the four appellees, only Mary Jo McGowan, Janet Burke, and Margaret Zamora were passengers in the elevator that allegedly malfunctioned. Richard Burke's claim is derivative of Janet Burke's. There were other passengers on the elevator during the incident, but they were not parties to this lawsuit.
[2] Mr. Mull did mention on direct examination that during a five-year hiatus when Millar was not the contracted servicing company for these elevators, the hydraulic cylinder of the elevator at issue had been replaced because the owner of the building discovered that it was leaking hydraulic oil underground.
[3] The buffers, or springs, are the objects at the bottom of the elevator shaft designed to cushion and stop the elevator should it go beneath its lowest floor, in this case the first floor. In normal operation, the elevator car should never get to that point.
[4] At deposition, Mr. Smith had never mentioned a hydraulic leak possibility. At his deposition, when asked to explain his theory of the cause of the incident, he said that for some reason, which he never clarified, one of the switches had failed to tell the main controller to stop the elevator car at the first floor. He based this theory on the service record that showed that one of these switches was serviced the next day. He also admitted to not knowing whether the elevator car ever hit the buffer.
[5] The jury had already heard much about the "logic" that was the main control system of the elevator, the "brain" that received electrical signals from the buttons and switches, processed them, and then told the elevator where, when, and how to stop and go.
[6] Dr. Manning answered this juror question in the following manner:

The reason on that is that valves are in a system, and the system is a large system. And when the valve will open and close, you don't have any problems with it. It just goes for years and years.
And the only way that it could have a malfunction is if you got something caught in it or somethingand a valve will get jammed shut anyway.
So what happens if something does get caught in it, it doesn't allow you to go down very fast. And you have plenty of buffer down there that if you do come down with it open a little bit, you're never going to get a very high speed.
And eventhe elevator is so designed that if you hit the buffer at 200 feet a minute [as plaintiff's expert had calculated], the rated speed [i.e., normal traveling speed], it could only go as fast as you can get the fluid out through the valve. And if the valve is closed almost, you can't get a lot of material out. So it can't go very fast.
Whatthe elevator is designed to take two hundred feet down on that buffer and not give you anyand still follow the elevator code and not give you any abnormal loads.
[7] When the motion for mistrial was first made, the court stated that if there were new expert testimony it was initially inclined to grant the motion for mistrial then and there. Upon hearing this, plaintiffs' counsel stated he would withdraw the motion if the court would not reserve ruling. Millar claims that this confirms that the motion for mistrial was a tactical afterthought and shows that counsel was not truly concerned about what he had argued was a new opinion by the experts.
[8] Only the principle of conserving judicial resources is reflected in this case. As for the other principle outlined by the supreme court in Ed Ricke & Sons. Inc. v. Green, 468 So.2d 908 (Fla.1985), we cannot conclude under the circumstances presented here that Millar's counsel engaged in any intentional misconduct, with an express purpose that his client profit therefrom, so as to force plaintiffs' counsel to move for a mistrial against his clients' best interest, as deplored by the supreme court. See id. at 910 (describing an unfortunate but common practice by trial attorneys to revive a failing case).
[9] Plaintiffs' counsel had an earlier warning about a potential theory of a hydraulic oil drain causing the incident when one alert and knowledgeable juror submitted the question to Mr. Mull inquiring about the effect of a hydraulic leak on the functioning of this style of elevator. Slip opinion at 4. With a hydraulic leak on the minds of the jury, Mr. Smith's alleged change in theory became potentially more damaging to the plaintiffs' case and their three-simultaneous-switching-systems-failure theory, because the "new" stuck-open valve defense theory more closely matched the operation of the elevator with the passengers' descriptions and exonerated the electromagnetic and mechanical switches as a cause of the incident.