931 So.2d 259 (2006)
Joan C. DORSEY, as Personal Representative, etc., et al., Appellant,
v.
Karan Gaddam REDDY, M.D., et al., Appellees.
No. 5D04-3521.
District Court of Appeal of Florida, Fifth District.
June 23, 2006.
*261 Nolan Carter and Michelle L. Kelson of the Law Offices of Nolan Carter, P.A., Orlando, for Appellant.
Paul A. Nugent and Kevin T. O'Hara, Sanford, for Appellee.
THOMPSON, J.
Joan C. Dorsey ("Dorsey"), the surviving spouse of Benny Dorsey, timely appeals a judgment in favor of Benny Dorsey's cardiologist, Dr. Karan Gaddam Reddy. The jury decided there was no negligence by Dr. Reddy that was the legal cause of Benny Dorsey's death, and the court entered final judgment and denied Dorsey's motion for new trial. On appeal, Dorsey contends that the court erred by: (1) admitting Dr. Reddy's testimony regarding Benny Dorsey's care that, Dorsey alleged, constituted inadmissible hearsay; (2) denying her request for an additional preemptory challenge because a juror should have been excused for cause; and (3) denying her motion for mistrial after Dr. Reddy testified he had been named the top cardiologist in Orlando by Money Magazine. We affirm.

FACTS
Dr. Joseph Boyer performed double coronary bypass surgery on Benny Dorsey on 12 March 1997. A CT scan on 17 March 1997 revealed that he had a Type I dissection.[1] Dr. Reddy conducted a test called a transesophageal echocardiogram ("TEE") on the morning of 18 March 1997, and performed an arteriogram under Dr. Boyer's order. Benny Dorsey died during or immediately after the arteriogram.
Dorsey alleged that Dr. Reddy was negligent because he: (1) failed to timely notify surgeons of the Type I dissection; (2) followed alleged orders to conduct the TEE and arteriogram on the following day; and (3) failed to discharge the surgeons on 17 March 1997 and find a surgeon to operate immediately.

Tests
Dorsey contested the need for the TEE or the arteriogram. Dorsey called Dr. Cary Stowe, a cardiac surgeon in Dr. Boyer's group, who testified that each dissection was different; some patients need only replacement of sections of their aortas, some require coronary artery bypasses, and some require replacement of their aortic valves. Thus, in a situation like Benny Dorsey's, where there are two grafts from bypass surgery, it is best to acquire as much information as possible, because repairing the dissection may not be as simple as patching the aorta.
Dr. Stowe testified that his group relied on the TEE because it could show whether the dissection involves the aortic valve and *262 provides more specific information than the CT scan. Dr. Boyer, the surgeon scheduled to repair the dissection and primarily responsible for Benny Dorsey until discharge, testified that he "[a]bsolutely" would have ordered the TEE because it would allow him to plan the "very complex, very difficult-risk operation"; a CT scan did not provide enough information for an operation on a patient after bypass surgery.
Dr. Stowe testified that it would be reasonable for Dr. Boyer to order an arteriogram; he did not fault the test's order or performance. Dr. Boyer testified that he ordered the arteriogram, the "gold standard" of tests, because it provided the best picture of the condition of the aorta and arch. Dr. Boyer would not have operated without one because that would have been negligent. He ordered it despite the risk that an arteriogram could perforate an artery, and could not criticize Dr. Reddy's actions.
Dr. Sandeep Bajaj, a cardiologist and Dr. Reddy's partner, emphasized the arteriogram's necessity because a surgeon must know the locations of aortic tears. Without one, a surgeon securing any obvious tears could not determine what else was wrong with the aorta and arch. Similarly, Dr. Reddy testified that, if the surgeon repairing the dissection does not know to repair, for example, the aortic arch bypass grafts or carotid arteries, the patient would not survive. The arteriogram was also needed because the CT and TEE can lead to false positives, which create the risk of dangerous but unnecessary operations. Accordingly, Dr. Reddy agreed with the decision to run further tests before surgery.
Dr. Philip Totonelly, Dorsey's medical expert and a cardiologist practicing in New York, offered the only testimony against the tests' desirability. He would have refused to perform an arteriogram and "would say, look, we're talking about salvaging this individual's life, we're not talking about fancy surgery here"; an arteriogram would be "absolutely crazy." There would be no reason to get a TEE. Dr. Totonelly testified that Dr. Reddy should have moved Benny Dorsey to an operating room immediately; if a surgeon would not perform without further tests, Dr. Reddy should have fired him and acquired another. Dr. Totonelly would have fired both surgeons for not operating immediately.
Drs. Boyer and Reddy agreed that Dr. Reddy could not have fired Dr. Boyer because Dr. Boyer was the surgeon with primary responsibility for Benny Dorsey. Both testified that, if Dr. Reddy had refused to perform the arteriogram, Dr. Boyer would have overridden him and selected another cardiologist to conduct the test.

Cause of death
The death certificate indicated that the dissection was the cause of death. Dorsey alleged that Dr. Reddy caused a tear in the aorta that caused blood to accumulate around Benny Dorsey's heart, causing a condition called cardiac tamponade.[2] The doctor who conducted the autopsy found evidence of two tears in the ascending aorta. He testified that one of the tears was the dissection, and he believed the other one occurred during the arteriogram and caused the tamponade. The other doctors involved directly in the case testified that tamponade was either extremely unlikely or impossible. Drs. Stowe and Bajaj testified that the surgeon conducting *263 bypass surgery opens the pericardium to allow blood to leak out so the heart cannot be compressed. Dr. Boyer confirmed he left the pericardium open to prevent tamponade, and the doctor who conducted the autopsy conceded the pericardium had been opened. Dr. Reddy testified that, when Benny Dorsey's blood pressure dropped almost to zero during the arteriogram, a catheter inserted into the heart showed no pressure; therefore, there was no tamponade.
Drs. Bajaj and Reddy testified that the cause of death was massive blood loss after the aorta ruptured. Dr. Boyer testified that Benny Dorsey died from an "acute ascending aortic dissection caused as a postoperative complication of his coronary bypass surgery," and that his death resulted from the bypass. The most likely cause of the dissection was the manipulation of his aorta during or after the bypass surgery. Significantly, Dr. Boyer testified, without objection, that he was sorry the surgery was unsuccessful: "It did not go the waythe system broke down. That's not Dr. Reddy's fault. That's our team's fault."
The doctors personally involved in the case emphasized that dissections created great risk; Dr. Stowe testified that, on a ten-point scale, an operation on an acute aortic dissection ranges between 9.5 and 10. In Dr. Stowe's experience, approximately 40% of patients undergoing surgery for a Type I dissection die. Dr. Boyer had only one other patient who experienced a dissection during or after surgery, and that patient did not survive. Dr. Bajaj had seen two other cases where a Type I dissection was diagnosed by cardiogram, and both patients died within one day of surgery. Dr. Reddy had one other patient experience a post-operation dissection, and that patient died. Only Dr. Totonelly disagreed about the risk: "I mean, the vast majority, overwhelming majority, from what I've seen in the literature and my experience, is they survive. They walk out of the hospital."

Alleged hearsay
Dorsey moved in limine to exclude any testimony regarding several conversations indicating that Dr. Reddy followed the orders of Drs. Stowe and Boyer by conducting the TEE and arteriogram. Specifically, she sought to exclude testimony that: 1) Dr. Reddy received a phone call on the morning of 17 March 1997 from a radiologist, advising him that the chest CT scan showed a Type I dissection; 2) Dr. Stowe ordered a TEE for the following morning and said he would have someone check on Benny Dorsey that day; and 3) Dr. Boyer ordered the TEE and arteriogram on the morning of 18 March 1997. Dorsey alleged there were no orders and that any testimony about these conversations would be offered to establish their truth, thus rendering the statements self-serving, inadmissible hearsay. Dr. Reddy responded that Dr. Boyer's statements were admissible as a hearsay exception under section 90.803(3) because the plans of Dr. Boyer, Dr. Stowe, and the radiologist related to an issue in the case, i.e., Benny Dorsey's treatment. The court agreed and denied Dorsey's motions.

Radiologist conversation
Dr. Reddy testified that, between 11:00 a.m. and 1:00 p.m. on 17 March 1997, a radiologist telephoned him and said that a CT scan indicated Benny Dorsey had a Type I dissection extending from the aortic valve to the descending aorta.

Dr. Stowe conversation
Dr. Reddy testified about the conversation with Dr. Stowe:
So I called up Florida Hospital and located Dr. Stowe in the operating room.
And I, in fact, interrupted him while he *264 was doing surgery and talked to him, that his patient has a type one aortic dissection.
Normally, if it's not urgent, we don't want to interrupt surgery . . . but I felt that this was significant enough to let him know that the patient did have a type one aortic dissection. . . .
* * *
Dr. Stowe told me that this is a very complicated problem and this is not an easy problem to fix and this is not the kind of problem you jump into.
And since Dr. Boyer is the one who did the surgery, since he is the one who is most familiar with what happened during the surgery, he felt that we don't need to jump into surgery right away, that he's going to let Dr. Boyer know, or he would himself or one of his partners will come by and evaluate him.
But he suggested that I should get a[TEE] in AM to further evaluate aortic dissection. I think my understanding was that he didn't necessarily want to take him to surgery right away.
My take on that was that maybe he wants to, either himself or somebody from surgery, wants to evaluate him. . . . [T]he instruction to me was to arrange for a[TEE] in AM.
Dr. Stowe testified that he did not recall this conversation, which did not sound like something he would have said. He ordinarily would not order a TEE unless there was a question of the diagnosis, and the patient probably would have needed emergency surgery. If he was in surgery with another patient, he probably would have ordered someone to prepare Benny Dorsey for emergency surgery. However, Dr. Stowe did not deny the conversation occurred; rather, if it did, he did not remember. He agreed that, if there was a complication, Dr. Boyer, as Benny Dorsey's surgeon, would need to address it. If Dr. Stowe would have received a call from Dr. Reddy during surgery, Dr. Stowe would have directed him to call Dr. Boyer's group to find Dr. Boyer or someone else. However, if Dr. Reddy could not reach Dr. Boyer, it would have been reasonable to contact him.
Drs. Reddy and Bajaj testified that Dr. Reddy told Dr. Bajaj about the Type I dissection and instructed him to check on Dorsey. Dr. Bajaj encountered Dr. Boyer's physician's assistant, who was also checking Dorsey; Dr. Reddy believed the assistant did so under orders from Dr. Stowe or Dr. Boyer's office.

Dr. Boyer conversations
Dr. Reddy testified that he could not reach Dr. Boyer on 17 March 1997, but left him a message to call back. When he spoke with Dr. Boyer on the morning on 18 March 1997, Dr. Boyer told him to do the TEE and call him back, but that he probably wanted Dr. Reddy to proceed with the arteriogram. They spoke again after the TEE, and Dr. Boyer said he needed the arteriogram before he could proceed with surgery. Dr. Boyer knew the TEE had been directed from his group.
Dr. Boyer testified that Dr. Reddy tried to reach him on 17 March 1997. He did not recall ordering a TEE; he believed Dr. Stowe ordered it. Dr. Boyer spoke with Dr. Reddy "pretty early" in the morning on March 18th. He did not recall talking with Dr. Reddy before the TEE, but he "may very well have." He "[a]bsolutely" would have ordered the TEE, because the CT scan would not provide enough information.

ANALYSIS
We briefly address Dorsey's claims of error regarding the denial of her request for an additional preemptory challenge and *265 her motion for mistrial before turning to the question of alleged hearsay.

A. Preemptory Challenge
Dorsey argued that one of the jurors should have been excused for cause. We find no error in the court's denial of her request for an additional preemptory challenge. The trial court enjoys great discretion in ruling on challenges of jurors for cause. Ivey v. State, 855 So.2d 1169, 1171 (Fla. 5th DCA 2003) (citing Gore v. State, 706 So.2d 1328, 1332 (Fla.1997)). "The test for determining juror competency is whether the juror can lay aside any bias or prejudice and render a verdict solely on the evidence presented and the instructions on the law given by the court." Smith v. State, 907 So.2d 582, 585 (Fla. 5th DCA 2005) (citing Busby v. State, 894 So.2d 88, 95 (Fla.2004)); Ivey, 855 So.2d at 1171. If the juror declares and the court determines that the juror "can render an impartial verdict according to the evidence," a challenge for cause should not be granted. Guzman v. State, 934 So.2d 11, 2006 WL 335479 (Fla. 3d DCA Feb. 15, 2006) (citing § 913.03(10), Fla. Stat. (2003)). The trial court's decision will not be disturbed on appeal without a showing of manifest error. Ivey, 855 So.2d at 1171. Its decision must be upheld if there is competent record support for that decision. Id. We find ample record support for the trial court's decision. None of the juror's testimony suggested the existence of impermissible prejudice or bias. Cf. Somerville v. Ahuja, 902 So.2d 930, 936 (Fla. 5th DCA 2005).

B. Motion for Mistrial
The court did not err in denying Dorsey's motion for mistrial, which was made one day after Dr. Reddy testified, without objection, that a Money Magazine survey had named him the top cardiologist in Orlando. The trial court enjoys broad discretion in deciding whether to grant a mistrial, but it should not grant a mistrial "unless an absolute legal necessity to do so exists." Gonzalez v. Largen, 790 So.2d 497, 500 (Fla. 5th DCA 2001) (citing White v. Consol. Freightways Corp. of Delaware, 766 So.2d 1228, 1232 (Fla. 1st DCA 2000)). Dorsey cites two cases that note in passing that it is error to permit a doctor to testify that he was named a top doctor in a survey or magazine. See Liberatore v. Kaufman, 835 So.2d 404, 407 (Fla. 4th DCA 2003); Tomlian v. Grenitz, 782 So.2d 905, 907 (Fla. 4th DCA 2001), rev'd on other grounds, Grenitz v. Tomlian, 858 So.2d 999 (Fla.2003). Neither case suggests that such a statement is per se reversible or fundamental error.
"To provide a trial court with the opportunity to correct errors, a timely objection is necessary." Millar Elevator Serv. Co. v. McGowan, 819 So.2d 145, 153 (Fla. 2d DCA 2002) (quoting City of Orlando v. Birmingham, 539 So.2d 1133 (Fla. 1989)); see also Ed Ricke & Sons, Inc. v. Green, 468 So.2d 908, 910 (Fla.1985) (reiterating that, "[u]nless the improper argument constitutes a fundamental error, a motion for mistrial must be made `at the time the improper comment was made'"). The court in McGowan applied this rule in a situation similar to that here. It concluded plaintiffs had not timely moved for mistrial because they failed to make a contemporaneous objection to testimony during the defense's case-in-chief; rather, they moved for mistrial on the day after the objectionable comments were made. Id. at 152-53. The motion for mistrial here was similarly untimely. Moreover, Dr. Reddy's statement regarding one survey "did not rise to an error of fundamental dimension." Id. at 153 (citing Murphy v. Int'l Robotic Sys., Inc., 766 So.2d 1010 (Fla.2000)); see also Hargrove v. Howell, 884 So.2d 960, 962 (Fla. 1st DCA 2004).

*266 C. Alleged Hearsay

We affirm the trial court's denial of Dorsey's motions in limine, which challenged alleged hearsay, though the trial court admitted much of the alleged hearsay for the wrong reason. The trial court's decision regarding the admission of testimony is reviewed for abuse of discretion. See, e.g., Shultheis v. Gotlin, 919 So.2d 546, 549 (Fla. 5th DCA 2005). The court's ruling on an evidentiary matter will be affirmed even if the court ruled for the wrong reasons, as long as the evidence or an alternative theory supports the ruling. See, e.g., Muhammad v. State, 782 So.2d 343, 359 (Fla.2001) (considering the argument, not presented below, that the testimony at issue was nonhearsay rather than hearsay admissible under section 90.803(3)(a)2).
"`Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." § 90.801(1)(c), Fla. Stat. (1999); see also Diaz v. State, 890 So.2d 556, 558 (Fla. 5th DCA 2005). Hearsay is generally inadmissible because the declarant does not testify under oath, the factfinder cannot observe the declarant's demeanor, and the declarant cannot be cross-examined. Breedlove v. State, 413 So.2d 1, 6 (Fla. 1982); Diaz, 890 So.2d at 558. "The hearsay rule does not prevent a witness from testifying as to what he has heard; it is rather a restriction on the proof of fact through extrajudicial statements." Breedlove, 413 So.2d at 6 (quoting Dutton v. Evans, 400 U.S. 74, 88, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970)); Diaz, 890 So.2d at 558. Out-of-court statements are hearsay only if offered to prove the truth of the matter asserted. Breedlove, 413 So.2d at 6; Diaz, 890 So.2d at 558; Buchanan v. State, 743 So.2d 59, 61 (Fla. 2d DCA 1999). "The hearsay objection is unavailing when the inquiry is not directed to the truth of the words spoken, but, rather, to whether they were in fact spoken." Breedlove, 413 So.2d at 6 (citation omitted); Buchanan, 743 So.2d at 61.
The court admitted the testimony regarding out-of-court statements by the radiologist, Dr. Stowe, and Dr. Boyer under section 90.803(3)(a)2, which provides that testimony is admissible if it is "[a] statement of the declarant's then-existing state of mind, . . . including a statement of intent, plan, motive, [or] design, ... when such evidence is offered to ... [p]rove or explain acts of subsequent conduct of the declarant." A statement may be admitted under this exception only if there is evidence demonstrating that the declarant acted in accord with the statement of intent. Ibar v. State, 31 Fla. L. Weekly S149, ___ So.2d ___, 2006 WL 560586 (Fla. Mar. 9, 2006). "[A] declarant's statement of intent under section 90.803(3) is only admissible to infer the future act of the declarant, not the future act of another person." Brooks v. State, 787 So.2d 765, 770-71 (Fla.2001).
The court below did not determine the relationship between the alleged hearsay statements and the future acts of each declarant. On appeal, Dr. Reddy asserts that he was the declarant of the statements made by the radiologist, Dr. Stowe, and Dr. Boyer. Dorsey correctly notes that the declarants, rather, were the radiologist, Dr. Stowe, and Dr. Boyer. Of the testimony challenged on appeal, the only statement arguably admissible under section 90.803(3) was Dr. Stowe's statement that he would have one of the doctors evaluate Benny Dorsey. That statement would permit the inference that Dr. Stowe informed one of the doctors in his group, which, according to Drs. Reddy and Bajaj, sent Dr. Boyer's physician assistant to evaluate Benny Dorsey.
*267 Nevertheless, we conclude that the challenged testimony was admissible. Dr. Reddy testified that the radiologist informed him of a Type I dissection on 17 March 1997. This statement was not hearsay because it was not offered to show the truth of the matter assertedthat Benny Dorsey had the dissectionbut to show that Dr. Reddy had notice of the dissection. See Sibley v. State, 636 So.2d 893, 893-94 (Fla. 5th DCA 1994); see also Charles W. Ehrhardt, Florida Evidence § 801.4 (2001).
Dorsey cannot demonstrate reversible error with respect to the conversations with Drs. Stowe and Boyer, though the court admitted them on the wrong basis. Dr. Reddy's testimony regarding his conversation with Dr. Stowe contained some statements that were conceivably hearsay, i.e., the fact that Dr. Stowe was conducting surgery or Dr. Stowe's description of surgical risk. Nevertheless, we do not reverse the judgment because an examination of the entire case shows that any error resulting in admitting these tangential statements was harmless and did not cause a miscarriage of justice. See § 59.041, Fla. Stat. (1999).
The thrust of Dorsey's objection was that the alleged hearsay statements were inadmissible because they concerned orders from Drs. Stowe and Boyer; the admission of the statements would allow Dr. Reddy to "shift the blame" unfairly. Thus, Dorsey objected not "to the truth of the words spoken, but, rather, to whether they were in fact spoken." See Breedlove, 413 So.2d at 6; Buchanan, 743 So.2d at 61.[3] Dr. Stowe's order to conduct a TEE and Dr. Boyer's order to conduct a TEE and cardiogram did not constitute hearsay, because the orders did not make an assertion. In a similar situation, we held that testimony regarding instructions given to an employee was admissible because the instructions did not make an assertion. See Vucinich v. Ross, 893 So.2d 690, 695 (Fla. 5th DCA 2005); see also United States v. Shepherd, 739 F.2d 510, 514 (10th Cir.1984) (holding that orders or instructions were neither true nor false, but "were offered to show that they occurred rather than to prove the truth of something asserted"); United States v. Cuttino, 106 Fed.Appx. 156, 158-59 (4th Cir.2004) (unpublished opinion) (observing that "[a]n order or instruction ... is `neither true nor false and thus cannot be offered for its truth []'" and therefore is not hearsay); United States v. Taylor, 812 F.2d 1409 (6th Cir.1987) (unpublished opinion) (stating that "[t]he testimony concerning the instructions was offered to show that they were made, not to prove the truth of any assertion which one might imagine is contained in the instructions"). Admitting testimony regarding the alleged orders did not implicate the traditional concerns raised by hearsay; here, Drs. Reddy, Stowe, and Boyer all testified under oath about the alleged orders and were subject to cross-examination, and the jury was able to observe each doctor's demeanor. Accordingly, we affirm the court's denial of Dorsey's motions in limine and its admission of the alleged hearsay because the ruling, though made for the wrong reason, was supported by the evidence or any alternative theory. See, e.g., Muhammad, 782 So.2d at 359.
AFFIRMED.
GRIFFIN and MONACO, JJ., concur.
NOTES
[1] A dissection is a split in the aortic wall. A Type I dissection usually starts in the ascending aorta, and generally requires surgery. A Type III dissection usually begins past the transverse origin arch and involves the descending aorta; in this case, surgery is avoided when possible.
[2] Cardiac tamponade occurs when blood collects around the heart but within the pericardium, compressing the heart.
[3] It was undisputed that Dr. Boyer ordered the arteriogram; Dorsey learned this during discovery, but nevertheless argued that the testimony regarding the order should be excluded as hearsay.