LAWSON, J.
 

 In this medical malpractice case, Dr. David Spalding and Melbourne Internal Medicine Associates, P.A. (collectively, “Defendants”) appeal from an order granting a new trial to Itzak Zatz (“Plaintiff’), as personal representative of the estate of Margaret Zatz (“Mrs.Zatz”). The trial court granted a new trial based on its finding that one of Defendants’ experts, Dr. Berlet, substantially changed his testimony on a critical causation issue from deposition to trial, which surprised and prejudiced Plaintiffs case. Because Plaintiff failed to object to the testimony on this basis when it was introduced, or otherwise alert the trial court to the issue during trial, when any prejudice could have been avoided or cured, we find that the trial court erred in granting a new trial on this basis, and reverse.
 

 Background
 

 Mrs. Zatz began having pain in her upper back near her left shoulder blade in September 2002. It was ultimately determined that she had a cancerous tumor in the intra-scapular area, which was surgically removed. However, the cancer metastasized to the lungs, and Mrs. Zatz died from complications related to the lung cancer in December 2005. Plaintiff faulted Defendants for not promptly ordering an MRI that would have led to discovery of the tumor before the cancer metastasized to the lungs. Defendants defended on several theories, including one that the cancer had already metastasized to the lungs by the time that Mrs. Zatz presented to Dr. Spalding in December 2002 for diagnosis and treatment. When the metastasis occurred was one of the hotly contested factual issues at trial, with Defendants presenting the testimony of three experts, including Dr. Berlet, on the issue.
 

 Defendants’ expert oncologist, Dr. Blau-stein, believed there “clearly were cancer cells in Mrs. Zatz’s lungs prior to [Mrs. Zatz first appointment with Dr. Spalding].” He based this opinion on estimating the number of cancer cells in the lungs after the cancer was discovered, and subtracting the growth rate. From that calculation, he determined that Mrs. Zatz had approximately 448,000 cancer cells in her lungs before her first appointment with Dr. Spalding. Dr. Healey, an orthopedic oncologist (surgeon), opined that Mrs. Zatz had pulmonary metastasis “from the outset ... based on the size of the lesions that were identified certainly in September, and were, I think, in retrospect clear
 
 *694
 
 ly present in June and possibly even in March in the CAT scan imaging.” He clarified that “from the outset” meant “as early as the prior August when she started having symptoms, and certainly from the fall.” Thus, any alleged delay in diagnosis had “no relation to her death.”
 

 Dr. Berlet’s testimony related to the March 2003 image of Mrs. Zatz’s lungs referred to by Dr. Healey. As to this issue, Dr. Berlet opined that the March scan contained “a number of lesions that are highly suggestive of pre-existing and metastatic disease to the lungs.” He showed the jury these areas on the film, and compared the March scan to lung scans performed on June 5, 2003 and September 19, 2003, to show how the cancer progressed over time. Dr. Berlet explained that he could not have diagnosed cancer from the March scan alone because the lesions he identified on that scan could have been something else. But, he testified that by comparing the same areas of the lung in the later scans, he could see changes from which he could testify that the March scan did evidence cancer.
 

 Plaintiff countered this defense testimony with live expert testimony and by reading into the record the depositions of three of Mrs. Zatz’s treating physicians from Shands Teaching Hospital. Mrs. Zatz’s treating radiologist, Dr. Bush, testified that he could not determine from the September 2003 scan when metastasis first occurred in the lungs, and that any abnormalities from the March scan had resolved by the June 2003 scan, such that the March scan did not evidence cancer. Mrs. Zatz’s surgeon, Dr. Vlasak, testified that he did not see any sign of metastasis during the July 2003 surgery. Mrs. Zatz’s treating oncologist, Dr. Zlotecki, was not as helpful to Plaintiff on this point, but still contradicted the testimony of Defendants’ experts. He testified that there was evidence of “metastatic involvement” in the lungs “at least by June of 2003” and “obviously” before the July 2003 surgery, but that it would be “impossible to speculate” as to whether the cancer had metastasized any earlier. Plaintiffs retained experts, oncologist Dr. Evens and pathologist Dr. Hadju, testified live at trial that they did not observe any signs of metastasis to the lungs until the June 2003 scans.
 

 To understand the nature of the controversy surrounding Dr. Berlet’s trial testimony it is necessary to backtrack and discuss his pretrial deposition. Toward the end of Plaintiffs direct deposition examination, Dr. Berlet testified that he would not be offering any opinions about when the metastasis occurred or regarding any of the lung scans. Then, at the end of Plaintiffs examination, Defendants’ counsel asked for a break to confer with Dr. Berlet. After counsel’s session with Dr. Berlet ended, defense counsel then began eliciting opinions from Dr. Berlet about the topics on which Dr. Berlet had before said that he had no opinions. The following occurred during defense counsel’s deposition cross-examination:
 

 Q Now, I understand that we don’t judge people by retrospective thinking, but now in looking at where the tumor eventually was diagnosed in September of '03 or December of '03 and then going back to the 3-27 films, do you see any evidence of potential lung involvement even on 3-27-03?
 

 A Well, there is something in the lung at the left lung base.
 

 Q Can you tell us what you see and describe it for the jury?
 

 [[Image here]]
 

 A Well, there are two nodules. And there’s some adjacent infiltrates. And it’s totally nonspecific, though, on this 3-27-2003.
 

 [[Image here]]
 

 
 *695
 
 Q Right. So you can’t tell exactly if that’s cancer just based on the radiology films, correct?
 

 A Correct.
 

 Q But when you go back and then look and see where the cancer eventually developed, it’s in the same place, correct?
 

 [[Image here]]
 

 A That’s one of the places.
 

 [[Image here]]
 

 Q And can’t cancer look like what you’re seeing on 3-27-03 in its early state?
 

 A Yes.
 

 On redirect examination, Plaintiffs counsel questioned Dr. Berlet extensively on these “additional opinions.” Dr. Berlet admitted that he had not noticed anything on the March scans that could have been cancer before conferring with defense counsel during the break. He also admitted that it would be “speculation” to say that what he saw on the March film was cancer, although he then clarified that cancer would have been part of the “differential diagnosis.” When asked again whether he would be offering an opinion at trial as to whether the March film evidenced metastatic cancer, Dr. Berlet responded: “I can’t say one way or the other.” He then reiterated that what he identified on the March scan: “[Cjould be anything. They could be little infiltrates. It could be scarring. It could be metastatic disease. It could be any of those things.”
 

 Before trial, Plaintiff filed a motion in limine to prohibit Dr. Berlet from “offering any evidence ... that Plaintiffs March 27, 2003, and June 5, 3003, radiology studies of the lungs contain evidence of metastasis or cancer,” on ground that the testimony would be “pure speculation.” Defense counsel argued that Dr. Berlet had testified during deposition that cancer was one of three possible explanations for the abnormalities identified on the March 2003 films, and that Dr. Berlet was “basically going to testify that there are multiple differential diagnosis [sic] in this case, and cancer is one of them, that the things he sees on 3-27 and the things he sees on 6-5 is [sic] in the same general location as to what was seen in September.” The trial judge denied Plaintiffs motion in limine based either upon a finding that the testimony was not speculative or upon case law indicating that a defending doctor can offer testimony of “possibilities” in a medical malpractice trial.
 
 See Haas v. Zaccaria,
 
 659 So.2d 1130, 1133 (Fla. 4th DCA 1995).
 
 [1]
 

 During trial, immediately prior to Dr. Berlet’s testimony, Plaintiff asked for a bench conference during which he sought to secure an agreement about the topics on which Dr. Berlet would be testifying at trial. A number of topics were discussed, including areas on which Dr. Berlet clearly did not offer an opinion during his deposition or at trial. Defense counsel repeatedly represented that Dr. Berlet would not be testifying differently at trial than he had during his deposition, with the judge stating: “I don’t want him changing anything he said,” and defense counsel assuring: “Oh, absolutely not, your Honor.”
 

 On several occasions, the trial judge offered to take a break and read the deposition, so that he would be prepared to settle any objections based upon an argument that Dr. Berlet was giving opinions at trial that were not disclosed during the deposi
 
 *696
 
 tion. However, neither party requested the break or indicated that it would be necessary for the judge to read the deposition. Instead, Defendants’ counsel suggested that “rather than trying to anticipate every potential opinion that he has, can we take it up as it comes?” Plaintiffs counsel agreed, responding that: “We’ll go forward from here, Judge.”
 

 Dr. Berlet’s direct examination proceeded, with Dr. Berlet opining that the cancer had metastasized into Mrs. Zatz’s lungs at least as early as the March lung scans, and bolstering this opinion by reviewing the scans with the jury (using magnified or enlarged trial exhibits). Plaintiff never once objected that his opinions were in any way different from the testimony he had given during his deposition; never objected to the trial exhibits; and, never claimed to be surprised by this testimony during the trial. Instead, Plaintiff cross-examined Dr. Berlet about how his opinion on the lung issue had evolved. During this cross-examination, Dr. Berlet admitted that in the first part of his deposition he had stated that he would not offer any opinion about the March CT scan of the lung. He admitted that during a break, defense counsel reminded him about a pri- or discussion they had had regarding the chest scan. At that point, the following exchange occurred:
 

 Q Isn’t it true, even after you came back from that break where he discussed that stuff with you, Doctor, and you started offering opinions on the 3/27 CT of the chest, you said your opinions in terms of whether that indicated early onset of metastasis would be purely speculative?
 

 A That’s true.
 

 Q All right. And then you weren’t going to offer any additional opinions even then after the break about the June CT scan of the chest?
 

 A I didn’t say that. I said — I said there were two or three lesions that I thought could represent metastatic disease. Then you asked me could these be non-specific findings, could they represent infiltrates, could they represent inflammatory disease, could they represent granulomas, and that’s all true, particularly prospectively.
 

 Like if you were looking at the 3/27 film, and you never looked back, in other words, you didn’t have that advantage of retrospective analysis, you wouldn’t know. I mean, some of these weren’t even mentioned by the radiologist, and they were very subtle findings. I just think when I’m looking at this, they are very compelling.
 

 After further questioning on other issues, Plaintiffs counsel returned to the issue of how Dr. Berlet’s opinion evolved over time.
 

 Q In terms of the conference with [defense counsel] in terms of the MRIs— I’m sorry — the lung studies, initially you had no opinions about those showing anything that would be important to this case. Then you take a break. [Defense counsel] and you discuss the March study, and you come back and you offer for the first time that there is something in the lung base. That was your next opinion.
 

 A That’s right.
 

 [[Image here]]
 

 Q Then [defense counsel], during the deposition, pulls out the 6/5 one and asks you to look at that, correct?
 

 A Yes. That’s right.
 

 Q And you offered your opinions then which were final about that, correct?
 

 A Correct.
 

 Q And you said at that time that even after looking at all those films, all the three, the September one, the June one,
 
 *697
 
 and the March one, I asked you if you were going to be offering any opinions that they represent the beginning stages of metastatic disease. Do you remember that?
 

 A Yeah.
 

 Q And you said, “I can’t say one way or the other. I mean, they could be anything. They could be little infiltrates. It could be scarring. It could be metastatic disease. It could be any of those things.” Correct?
 

 A Yes.
 

 Then, in closing argument, Plaintiffs counsel focused on how Dr. Berlet had changed his testimony:
 

 Dr. Berlet, nice guy, very nice pictures that he showed you, but he disagreed with virtually every treating radiologist in this case, four or five different radiologists that he disagrees with, and, coincidentally, all in favor of the defense. And, coincidentally, on issues that he said initially after reviewing all the studies he had no opinions about. But after being spoon-fed information, and taking a break and having [defense counsel] show him the same studies he’s already looked at and says I have no comments on, he comes back and says, oh, yeah, that too. That too. But I’m speculating. I’m looking at them now, and I can’t tell you anything about this. I can’t tell you at all that it represents early metastatic cancer. That’s what he said in his deposition.
 

 Then I said, do you have any comments about the later one? No, no comments about the later one. Oh, well, [defense counsel] gave him information about that as well, and then suddenly more speculation. Speculation then, at that time, turns into opinions here even though he said in his deposition that the lung tumors or the lung identifying— things he identified, that all the treating radiologists looked at, didn’t grow in between the two in comparing them, indicated it wasn’t cancer. But he came in, he disagreed with those radiologists, those treating physicians who not only compared them at the time, but under intense questioning while they pulled those studies back up again.
 

 Dr. Bush looked at them and said, no, there is no cancer in March. What was shown there was a pneumonitis. It was non-specific, and it was cleared, that area was cleared by June. So, it didn’t represent early metastatic. So, that’s one, even though he said he was speculating, that Dr. Berlet wishes to disagree with.
 

 After the jury returned a defense verdict, Plaintiff moved for a new trial. Among the several grounds for new trial were the following related to this appeal: “(1) introduction of surprise and speculative testimony from defense expert, Mathew Berlet, M.D., that was not disclosed until Dr. Berlet testified at trial; (2) improper publishing of surprise exhibits related to key issues in the case which were never disclosed nor testified to by any witness; [and] (3) improper closing argument reinforcing surprise and speculative testimony of Dr. Berlet.... ” The trial court agreed that Dr. Berlet’s testimony materially varied from deposition to trial, and granted a new trial on this basis.
 

 Analysis
 

 Generally speaking, a party complaining of objectionable testimony is required to make a contemporaneous objection to that testimony and timely move for a mistrial in order to preserve the issue for appeal.
 
 Dorsey v. Reddy,
 
 931 So.2d 259, 265 (Fla. 5th DCA 2006). The purpose of this rule is give the trial court an opportunity to correct any alleged error.
 
 Id.
 
 The exception to this rule is if the error is fundamental.
 
 Id.
 

 
 *698
 
 This general rule also applies in the context of a motion for new trial based upon surprise testimony. As explained in
 
 Cordoba v. Rodriguez,
 
 939 So.2d 319 (Fla. 4th DCA 2006):
 

 Generally, a motion for a new trial based on an error occurring during the trial ■will not be granted unless the moving party had previously made an objection during trial at the time of the alleged error.... [And], where a trial court grants a new trial on the ground of unpreserved error, the court is not operating within the area of its discretion, and the ruling will be upheld only if the error corrected was fundamental.
 

 Id.
 
 at 322 (internal citations omitted). The
 
 Cordoba
 
 panel further explained that:
 
 “
 
 ‘Fundamental error,’ for purposes of granting a new trial, means an error which deprives a party of a fair trial or an error which objection or a curative instruction could not correct; such error gravely impairs the dispassionate and calm consideration of the evidence and merits by the jury.”
 
 Id.
 
 (citation omitted). “Whether an error is fundamental is reviewed on appeal as a question of law.”
 
 Id.
 
 (citation omitted).
 

 Applying this law, it is clear that the trial court should not have granted a new trial on the basis of Plaintiffs claimed surprise at Dr. Berlet’s testimony absent a finding of fundamental error. Again, Plaintiff never objected to the testimony on the basis of surprise and never, during the trial, brought to the judge’s attention his contention that Dr. Berlet was offering opinions that had not been disclosed prior to trial. In granting relief, the trial court did not find fundamental error. And, there is no reason to send the matter back for the trial court to conduct a fundamental error analysis when we review the issue
 
 de novo
 
 as a question of law.
 
 Id.
 

 As for whether the “surprise” testimony rises to the level of fundamental error, we readily conclude that it does not. First, we have a hard time even understanding how Plaintiff can claim surprise at Dr. Berlet’s opinions relating to the timing of metastasis into the lungs given that Plaintiff sought to exclude the opinions on other grounds by way of a pretrial motion in limine, and lost. Second, any difference between Dr. Berlet’s deposition and trial testimony is merely a matter of degree. He testified to the same basic conclusions both at deposition and at trial. Although his opinions clearly strengthened on this topic at trial, the trial court may well have limited Dr. Berlet’s testimony if the matter had been brought to the court’s attention. And, finally, Plaintiff was already prepared to address this topic at trial with its own contrary evidence — since the issue was being addressed by other defense experts as well.
 

 We also note that the same fundamental error analysis would apply if this issue is viewed as one of attorney misconduct (eliciting testimony contrary to the understanding between the trial judge and defense counsel that Dr. Berlet should not express opinions not testified to during deposition). As explained in
 
 Companioni v. City of Tampa,
 
 51 So.3d 452, 456 (Fla.2010), “when a party objects to instances of attorney misconduct during trial, and the objection is sustained, the party must also timely move for a mistrial in order to preserve the issue for a trial court’s review of a motion for a new trial. If the issue is not preserved in this manner, then the conduct is subject to fundamental error analysis ...”
 

 Finally, we note the similarity between this case and
 
 Millar Elevator Service Co. v. McGowan,
 
 819 So.2d 145 (Fla. 2d DCA 2002). There, the defendant in a personal injury lawsuit based on an alleged elevator
 
 *699
 
 malfunction appealed from an order granting the plaintiffs a new trial.
 
 Id.
 
 at 146. In their motion for new trial, the plaintiffs argued that the defendant had prejudiced them by offering surprise expert testimony on causation that was different from the expert’s deposition testimony. The trial court agreed and granted a new trial, but the appellate court reversed because the plaintiffs neither objected to the surprise testimony nor timely sought a mistrial.
 
 Id.
 
 at 147.
 

 Instead of objecting to the surprise defense testimony, the plaintiffs attempted to capitalize on this testimony in cross-examination by repeatedly highlighting the fact that the expert’s testimony had changed from deposition to trial.
 
 Id.
 
 at 149, 152. Then, in closing argument, the plaintiffs urged the jury to discredit the new theory because of the perceived changes in defense expert testimony.
 
 Id.
 
 at 152. The appellate court concluded that the error was waived because the plaintiffs failed to contemporaneously object. The court reasoned, in part:
 

 To provide a trial court with the opportunity to correct errors, a timely objection is necessary.
 
 City of Orlando v. Birmingham,
 
 589 So.2d 1133 (Fla.1989). This requirement also promotes judicial economy and prevents “a party from rolling the dice with the jury, confident that an unvoiced objection will garner a new trial if the verdict is unfavorable.”
 
 Lowe Inv. Corp. v. Clemente,
 
 685 So.2d 84, 85 (Fla. 2d DCA 1996) (citing
 
 Hargrove v. CSX Tramp. Inc.,
 
 631 So.2d 345, 346 (Fla. 2d DCA 1994)). In
 
 Lowe Investment Corp.,
 
 we warned:
 

 Trial counsel simply cannot allow error to occur without objection, hope they will win in spite of the error, and be confident of a new trial when the trial court has not been afforded the opportunity to cure the error. The cases are legion that warn trial counsel they cannot have their cake and eat it too.
 

 685 So.2d at 85. Here, plaintiffs’ counsel repeatedly questioned defense witnesses about this allegedly surprising “new theory,” never objected, never afforded the trial court a contemporaneous opportunity to correct the problem, and, in fact, attempted to use the “new theory” to plaintiffs’ advantage by arguing it in closing....
 

 [[Image here]]
 

 ... Plaintiffs’ counsel rolled the dice here and came up short. The trial court abused its discretion in granting the motion for mistrial.
 

 Finally, in the circumstances of this case, we further conclude that the unob-jected-to mention by defense witnesses of a “new” theory since deposition did not rise to an error of fundamental dimension.
 
 Murphy v. Int’l Robotic Sys., Inc.,
 
 766 So.2d 1010 (Fla.2000).
 

 Id.
 
 at 153.
 
 Millar Elevator
 
 is materially indistinguishable from our case as to the issue on appeal.
 

 Accordingly, we reverse the order granting new trial and remand the case to the trial court. Because Plaintiffs motion for new trial contained other grounds not reached by the trial court, we direct the court to consider the other issues raised in Plaintiffs motion on remand.
 

 REVERSED AND REMANDED WITH DIRECTIONS.
 

 GRIFFIN and PALMER, JJ., concur.
 

 [1]
 

 . Because Plaintiff did not challenge the trial court’s ruling on this issue by filing a cross-appeal, we do not address it. Additionally, we note that although Defendants argue in their initial brief that Dr. Berlet’s testimony cannot be excluded as speculative (presumably to avoid affirmance based upon a tipsy coachman analysis), Plaintiff did not respond to this argument in its answer brief.