WALLACE, Judge.
Deanne Schapell Gillett and John Gillett, her husband, sued Norman A. Moore, II, for damages because of personal injuries that Mrs. Gillett sustained in an automobile accident. A jury awarded Mrs. Gillett approximately $250,000 for her past and future medical expenses. However, the jury found that Mrs. Gillett did not sustain a permanent injury and did not award the Gilletts anything for noneconomic damages.
The trial court set aside the jury’s verdict and ordered a new trial based on alleged multiple instances of misconduct by Mr. Moore’s lead attorney (defense counsel).[1] Mr. Moore appeals the trial court’s order setting aside the jury’s verdict and granting the Gilletts a new trial (the new-trial order). Most of the instances of defense counsel’s conduct referenced in the new-trial order were either not improper or were not the subject of a preserved objection. To the extent that defense counsel’s conduct was both improper and not the subject of a preserved objection, we conclude that it did not rise to the level of fundamental error. For these reasons, we reverse the order and remand for the entry of a final judgment in accordance with the jury’s verdict.
I. THE FACTUAL BACKGROUND
The automobile accident occurred on January 19, 2000. Mr. Moore, who was driving a full-size pickup truck, ran a stop sign and struck the car driven by Mrs. Gillett. The force of the impact caused Mrs. Gillett’s car to spin 180 degrees and to collide with Mr. Moore’s truck a second time. Although the Gilletts filed their complaint in 2002, the case did not go to trial until September 2010, more than ten years after the accident.
At the beginning of the trial, Mr. Moore admitted liability for the accident. Mrs. Gillett dropped her claim for lost earnings and some of her medical claims. Mr. Gil-lett dropped his claim for loss of consortium.[2] Thus the primary issues at trial were the nature and the extent of Mrs. Gillett’s injuries resulting from the accident. The trial, which lasted ten days, *936 was largely a battle of medical and other expert witnesses.
Mrs. Gillett claimed that she had sustained permanent injuries to her left shoulder, left knee, neck, and lower back because of the accident. She also claimed that her injuries and resultant surgeries had caused her to develop a painful condition referred to at the trial as “reflex sympathetic dystrophy” (RSD). RSD is also known as “complex regional pain syndrome” (CRPS).[3] In closing argument, the Gilletts’ attorney requested an award of over nine million dollars.
Mr. Moore conceded that Mrs. Gillett had been injured in the accident, but he denied that she had suffered a permanent injury. The defense contended that either preexisting conditions or degenerative changes — or both — caused the problems that Mrs. Gillett experienced with her left shoulder, left knee, neck, and lower back. The defense denied that Mrs. Gillett had RSD. Instead, the defense contended-that Mrs. Gillett had a preexisting somatization disorder.[4] In closing argument, the defense suggested that it would be appropriate for the jury to award Mrs. Gillett some amount for her medical bills, but nothing more.
At the conclusion of the trial, the jury returned a verdict awarding Mrs. Gillett $26,434.40 for past medical expenses and $225,000 for future medical expenses. However, the jury found that Mrs. Gillett did not sustain a permanent injury because of the accident and awarded nothing to the Gilletts for noneconomic damages.
II. THE PROCEDURAL BACKGROUND
The Gilletts sought a new trial based solely on the alleged misconduct of defense counsel both before and during the trial. The Gilletts did not claim that the verdict was inadequate or against the weight of the evidence. They did not file a motion for additur.
After a daylong hearing, the trial court announced that it would set aside the verdict and grant the Gilletts a new trial. In a subsequent written order, the trial court described the trial as a “contentious” one, which resulted in “basically a defense verdict.” However, the trial court did not find that the verdict was against the weight of the evidence. Instead, the sole basis of the order is the alleged misconduct of defense counsel. The trial court did not base its decision to grant the Gilletts a new trial *937 on any single act or incident. Instead, the trial court emphasized that it based its ruling on “the totality” of defense counsel’s conduct:
[T]he Court has examined the cumulative nature of the defense attorney’s conduct over the course of the ten-day trial and finds that there was prejudicial conduct that made it impossible to have a fair and impartial trial for the Plaintiffs.
In reviewing and considering the totality of the defense attorney’s conduct, from voir dire to closing argument, the Court finds that his conduct cast doubt on the integrity and overall fairness of the trial, thus necessitating a new trial.
The trial court also found that defense counsel’s conduct violated “the Standards of Professional Courtesy and Professionalism adopted by the Sixth Judicial Circuit and the Florida Bar Rules of Professional Conduct.”
The structure of the new-trial order bears some examination. The order begins with a series of six preliminary findings describing various acts of alleged misconduct by defense counsel. After these and other preliminary observations, the order lists separately eight “highlights of the major issues on which the Court relied in granting” a new trial. The trial court repeated two of its preliminary findings in the eight “highlights” that form the stated basis for the new-trial order. The trial court mentioned the six other alleged acts of misconduct for the first time as “highlights.”
Taking into account the preliminary findings and the highlights in the new-trial order, the trial court attributed twelve separate types of misconduct to defense counsel. Several of the alleged acts of misconduct involve repetitive behaviors. We will not detail all of these alleged acts and behaviors here. Of the twelve asserted acts of misconduct, the Gilletts’ argument in support of the new-trial order places substantial emphasis on four grounds as involving preserved error.[5] The four grounds involving a claim of preserved error are as follows:
[ (1) Djuring the opening and closing, the defense attorney improperly referenced claims for damages made by Plaintiff that were dropped prior to the commencement of trial....
[[Image here]]
[ (2) Djuring the direct examination of Defendant’s expert witness, Dr. John Shim, defense attorney elicited new opinion testimony from Dr. Shim that Plaintiff did not have Reflex Sympathetic Dystrophy (RSD). Prior to trial, Dr. Shim had indicated in his report that he was deferring to other physicians regarding RSD and the defense attorney made statements during Dr. Shim’s deposition that he would not be offering opinions on RSD. Plaintiffs objected to Dr. Shim’s testimony regarding RSD; however, the Court permitted Dr. Shim to testify regarding RSD, not realizing the contents of the doctor’s report or the exchange during the deposition which was presented at the hearing on the Amended Motion for Mistrial.
[ (3) Djuring the defense attorney’s direct questioning of Dr. Harold Linde, a defense witness, the defense attorney, again and continuously, improperly testified by leading during his questioning of *938 the witness despite countless sustained objections and warnings from the Court.
[ (4) D]ue to defense attorney’s discovery violations and the failure to conduct an exhibit exchange as required under the Court’s Order Setting Jury Trial & Pretrial Conference dated December 30, 2009, and reaffirmed by the Court’s Uniform Pre-Trial Conference Order dated August 24, 2010, defense counsel improperly conducted a trial by ambush through the testimony of Defendant’s expert witness, Dr. Wilhelmina Korev-aar.
We will consider these four grounds separately in the discussion that follows.
After the trial court entered its new-trial order, Mr. Moore filed a motion to recuse the trial judge. The trial judge granted the motion, and the case was reassigned to Judge Amy Williams. Mr. Moore sought a reconsideration of the new-trial order, but Judge Williams declined to set the order aside.
III. THE STANDARD OF REVIEW
We review a circuit court’s order granting a motion for a new trial for abuse of discretion. Allstate Ins. Co. v. Manasse, 707 So.2d 1110, 1111 (Fla.1998). Moreover, “it takes a stronger showing of error in order to reverse an order granting a new trial than an order denying a new trial.” Harris v. Grunow, 71 So.3d 186, 188 (Fla. 3d DCA 2011) (quoting Greens to You, Inc. v. Gavelek, 967 So.2d 318, 320 (Fla. 3d DCA 2007)). Thus we begin with the presumption that the trial court properly exercised its discretion, and we will not disturb the trial court’s ruling absent a clear abuse of that discretion. Manasse, 707 So.2d at 1111. However, “such orders must nevertheless be supported by the record or by findings of influence outside the record.” Reynolds v. Towne Mgmt. of Fla., Inc., 426 So.2d 1011, 1013 (Fla. 2d DCA 1983). Hence, a ruling that is unsupported by the record constitutes a clear abuse of discretion. See Dobbins v. Dobbins, 584 So.2d 1113, 1116 (Fla. 1st DCA 1991); Earnest v. Se. Fid. Ins. Co., 422 So.2d 1092, 1093 (Fla. 3d DCA 1982). Accordingly, where a trial court’s finding of cumulative error is the basis for the alleged misconduct of defense counsel, and that finding is unsupported by the record, the reviewing court must reverse an order granting a new trial. Snapper Power Equip., Inc. v. Dozer, 605 So.2d 1012, 1013 (Fla. 4th DCA 1992).
IV. DISCUSSION

A. Improper References to “Dropped Claims.”

1. Background. An understanding of the trial court’s ruling on the “dropped claims” issue requires some explanation of the events occurring immediately before and at the beginning of the trial. At the pretrial conference, the Gilletts’ attorney (plaintiffs’ counsel) submitted a summary of Mrs. Gillett’s medical billings. This summary was sixteen pages long and contained eighty-three separate entries. Many of the entries included multiple billings. The medical billings included on the summary totaled $1,002,190.81. Plaintiffs’ counsel proposed to use the summary at trial in accordance with section 90.956, Florida Statutes (2010).
At the beginning of the trial, plaintiffs’ counsel filed a notice dropping a number of Mrs. Gillett’s claims, including a claim for past and future lost wages, a claim for lost earning capacity, and claims for six different medical conditions. One of the medical conditions that Mrs. Gillett chose not to pursue was a claim for migraine headaches.
After the announcement that Mrs. Gil-lett was dropping several of her claims and *939 after the filing of an appropriate notice of dismissal, plaintiffs’ counsel made a motion in limine to prohibit any reference at trial to Mrs. Gillett’s medical conditions that were unrelated to the medical conditions for which claims remained to be tried. In support of this motion in limine, plaintiffs’ counsel asserted: “This morning plaintiffs filed a [notice] of dropping claims for things like migraine headaches, TMJ. We don’t believe those are relevant anymore as plaintiff is no longer making a claim for those medical conditions.” After some discussion with counsel, the trial court announced that it would deny the motion in limine.
After the denial of the motion in limine concerning unrelated medical conditions, the parties made their opening statements. During defense counsel’s opening statement, he addressed Mrs. Gillett’s primary complaint of RSD as follows:
You can’t find a reason for it. They don’t know what caused it. And I’ll talk more about that in a bit. But that’s the way you diagnose it. It’s a diagnosis of exclusion. We want [to] find out what’s wrong, off you go to RSD. Now, that’s what their primary claim is here, not the claim of headaches that was dropped[], etc., etc.
I’m going to deal with RSD before I get back to the substance of what I’m talking about. As far as RSD—
(Emphasis added.) At this point, plaintiffs’ counsel interrupted, and a bench conference ensued. Plaintiffs’ counsel objected, “[defense counsel] can’t say that, referring to the claims we’ve dropped.” The trial court agreed and instructed defense counsel that “to be mentioning the claims [that were] dropped would be inappropriate.” The bench conference concluded, and defense counsel continued his opening statement without another reference to the dropped claims.
At this point, two things are worthy of note. First, the trial court had previously declined to preclude any references at the trial to Mrs. Gillett’s “unrelated medical conditions.” However, during defense counsel’s opening statement, the trial court cautioned him that it would be “inappropriate” to refer to such matters in the context of dropped claims. Although these two rulings can be reconciled, there is a certain tension between them. Defense counsel could easily have concluded from the denial of the motion in limine that comment on the dropped claims was permissible. Second, the trial court’s ruling on the objection to defense counsel’s isolated reference to the dropped claim for headaches was the first time that the trial court had informed defense counsel that he could not mention the dropped claims. Accordingly, defense counsel’s initial reference to the dropped claims could not constitute a violation of a prior court order because there was none.
During the trial, plaintiffs’ counsel introduced into evidence the summary of the medical billings that had been presented at the pretrial conference. However, plaintiffs’ counsel had not revised the summary to delete the charges attributable to the dropped claims. Thus the summary received in evidence, which totaled the billings at $1,002,190.81, included numerous billings representing the cost of treating a variety of medical conditions for which Mrs. Gillett was no longer making a claim.
After both sides had rested but before closing arguments, plaintiffs’ counsel addressed the discrepancy between the amount shown on the summary and the amount for past medical expenses that Mrs. Gillett was actually claiming. Out of the hearing of the jury, he announced, “We’ve made an adjustment to the medical bills. We’ve gone in and carefully pulled out anything that we believe is not RSD *940 related. And our new medical number is $475,086.85 in the past.” Plaintiffs’ counsel proposed to address the problem by withdrawing the summary from evidence. Defense counsel objected because one of Mrs. Gillett’s treating physicians had testified extensively with reference to the summary. After extensive discussions with counsel, the trial court ultimately ruled that the summary would remain in evidence and that defense counsel could “use” it in his closing argument. In context, the trial court’s ruling that defense counsel could “use” the summary in his closing would necessarily include permission to comment on it.
In closing, defense counsel said, in pertinent part:
What followed after that, even though [Mrs. Gillett] did not have a blow to the head and had not lost consciousness, she went to a neurologist because of complaints of headaches. Now, they are not claiming headaches in this case at this point. However, if you go to the bills that they submitted for your evaluation for you to award, included in those numbers are the bills from Spiegel, a neurologist. And they told you they brought every relevant physician here? They didn’t bring Garner in. Dr. Garner is the other neurologist that was treating Mrs. Gillett.
As you can see from the summary, she treated her for TMJ, she treated her for headaches that they are not claiming here, but they included almost $50,000 in bills for Dr. Garner in the bills that they want you to have Norman Moore quote—
At this point, plaintiffs’ counsel objected and another bench conference ensued. Plaintiffs’ counsel asked for a curative instruction and claimed that defense counsel had “made a blatantly false statement.” In support, he argued that “we took any of those bills out and [defense counsel is] testifying to things that are not true.” The trial court did not overrule or sustain the objection, and plaintiffs’ counsel did not ask for a ruling on his objection. However, the trial court expressly declined to give a curative instruction and told plaintiffs’ counsel that he was “free to discuss that in your part.” Thereafter, defense counsel discussed the bills included in the summary for approximately one-half page of the trial transcript without further objection by plaintiffs’ counsel.
2. Analysis. In the new-trial order, the trial court ruled that defense counsel “improperly referenced claims for damages made by Plaintiff that were dropped prior to the commencement of trial.” The Gilletts’ brief filed in support of the new-trial order does not direct us to any case law or other authority for the proposition that a reference to medical conditions for which claims were originally made but dropped at the beginning of trial is improper. Instead, the Gilletts argue that defense counsel violated “the trial court’s ruling during opening statement that mentioning dropped claims was inappropriate.” However, a review of the record reveals that defense counsel did not violate a trial court order by referencing the dropped claims.
During opening statement — as we have already seen — defense counsel did not mention the dropped claims again after the trial court’s initial ruling that further reference to the dropped claims would be “inappropriate.” Defense counsel did not violate the trial court’s ruling during closing argument either. The evidence in the case relative to the dropped claims changed substantially once plaintiffs’ counsel introduced the summary of the medical billings into evidence. More than one-half of the dollar amount of the billings in the summary represented medical conditions *941 for which Mrs. Gillett was no longer making a claim at trial. Because the summary was in evidence, defense counsel was certainly entitled to point out to the jury that the summary included billings for conditions related to claims that Mrs. Gillett was no longer making. The trial court recognized this point when it ruled that defense counsel could “use” the summary in his closing. The trial court also properly permitted plaintiffs’ counsel to reply to defense counsel’s comments.
In short, defense counsel complied with the trial court’s rulings concerning the dropped claims. His comments were not improper. The summary introduced into evidence by plaintiffs’ counsel overstated what Mrs. Gillett was actually claiming for past medical expenses by more than one hundred percent. To the extent that there was a problem at the trial concerning the dropped claims, plaintiffs’ counsel created it by introducing the summary into evidence and using it to question one of his witnesses. It follows that the record does not support the grant of a new trial based on defense counsel’s - references to the dropped claims.

B. Eliciting New Opinion Testimony fi'om Dr. John Shim.

1. Background. In the second ground, the trial court ruled that defense counsel “elicited new opinion testimony from Dr. [John] Shim that Plaintiff did not have Reflex Sympathetic Dystrophy (RSD).” A review of this basis for the new-trial order requires some background.
Dr. Shim is an orthopedic surgeon whom the defense retained to conduct an independent medical examination (IME) of Mrs. Gillett. The focus of Dr. Shim’s report and deposition testimony was on Mrs. Gillett’s shoulder, knee, neck, and lower back problems. During the deposition conducted by plaintiffs’ counsel, Dr. Shim testified that he was not a specialist in RSD or related disorders. Accordingly, Dr. Shim said that he would defer to other specialists regarding a diagnosis of RSD. Later in the deposition, defense counsel volunteered that Dr. Shim would not be offering any opinions concerning whether Mrs. Gillett had RSD.
The substantial majority of Dr. Shim’s testimony for the defense at trial — as at his deposition — concerned his opinions about Mrs. Gillett’s shoulder, knee, neck, and lower back problems. However, defense counsel did ask Dr. Shim whether he observed some of the clinical signs of RSD during his physical examination of Mrs. Gillett. When defense counsel began this line of inquiry, plaintiffs’ counsel objected, and the following colloquy ensued at the bench:
THE COURT: [Defense counsel], you can ask him what are the signs or symptoms, but to read him from the list one by one would be leading. That’s what I’m meaning.
[PLAINTIFFS’ COUNSEL]: One other thing, [defense counsel] deposed him, and he readily admits he’s not an RSD person, he’s not given RSD opinions, he’s not an RSD expert, he doesn’t treat RSD. So, he’s outside the scope of his report and testimony, you know, injecting new opinions that [Mrs. Gillett] doesn’t have any signs or symptoms. He clearly disqualifies himself in his report as clearly orthopedic.
[THE COURT]: You can ask him, certainly, those questions on cross-examination and—
[PLAINTIFFS’ COUNSEL]: Well, it’s—
THE COURT: He’s asked him are you — are you familiar with RSD. He says he has a general knowledge of it. So, we’ll let [defense counsel] continue to ask questions without leading just to *942 explore that a little bit, and I’ll keep that in mind but appreciate the information.
[PLAINTIFFS’ COUNSEL]: And the problem is he testifies all the RSD stuff in, in effect. And you, in effect, have an opinion from—
THE COURT: Then you’ll be standing up and—
[PLAINTIFFS’COUNSEL]: I will.
[THE COURT]: — and objecting.
[PLAINTIFFS’ COUNSEL]: I will.
THE COURT: Okay. Thank you.
(Emphasis added.) Thereafter, defense counsel resumed his examination of Dr. Shim concerning whether he noted some of the clinical signs of RSD on his physical examination of Mrs. Gillett. Dr. Shim testified — without further objection that such testimony was outside the scope of his prior report and deposition — that he did not observe such signs. Dr. Shim never testified that Mrs. Gillett did not have RSD. Indeed, on cross-examination, plaintiffs’ counsel twice asked Dr. Shim if he was offering opinions about RSD. Dr. Shim responded in the negative both times.
2. Analysis. We begin our review of this point by noting that the statement in the new-trial order that defense counsel elicited opinion testimony from Dr. Shim that Mrs. Gillett did not have RSD is inaccurate. Although Dr. Shim testified that he did not observe any clinical signs of RSD on his physical examination of Mrs. Gillett, he repeatedly disclaimed offering any opinions about a diagnosis of RSD. In overruling the objection to defense counsel’s line of questions about Dr. Shim’s observation of clinical signs of RSD, the trial court told plaintiffs counsel to object if Dr. Shim offered an opinion on RSD. After Dr. Shim’s testimony resumed, plaintiffs’ counsel never objected on that ground.
The trial court linked the issue of Dr. Shim’s testimony with other examples of defense counsel’s alleged misconduct. However, this ground for the new-trial order is more properly analyzed as an evidentiary issue under Binger v. King Pest Control, 401 So.2d 1310 (Fla.1981), and its progeny. Cf. Spalding v. Zatz, 70 So.3d 692, 698 (Fla. 5th DCA 2011) (noting that the claim of “surprise” testimony in that case might also be viewed as an issue of attorney misconduct). In Binger, the Supreme Court of Florida announced the test for trial courts to apply in determining whether an undisclosed witness should be precluded from testifying because of prejudice to the objecting party:
[A] trial court can properly exclude the testimony of a witness whose name has not been disclosed in accordance with a pretrial order. The discretion to do so must not be exercised blindly, however, and should be guided largely by a determination as to whether use of the undisclosed witness will prejudice the objecting party. Prejudice in this sense refers to the surprise in fact of the objecting party, and it is not dependent on the adverse nature of the testimony. Other factors which may enter into the trial court’s exercise of discretion are: (i) the objecting party’s ability to cure the prejudice or, similarly, his independent knowledge of the existence of the witness; (ii) the calling party’s possible intentional, or bad faith, noncompliance with the pretrial order; and (iii) the possible disruption of the orderly and efficient trial of the case.... If after considering these factors, and any others that are relevant, the trial court concludes that use of the undisclosed witness will not substantially endanger the fairness of the proceeding, the pretrial order mandating disclosure should *943 be modified and the witness should be allowed to testify.
Id. at 1313-14 (footnotes omitted). Under Binger, “the test for exclusion of evidence for non-disclosure during pretrial discovery is whether the opposing party was prejudiced in his preparations for trial.” Gouveia v. Phillips, 823 So.2d 215, 222 (Fla. 4th DCA 2002). “The Binger analysis should be applied where a medical expert changes his or her opinion, resulting in surprise and prejudice to the opposing party and necessitating a new trial.” Allstate Prop. & Cas. Ins. Co. v. Lewis, 14 So.3d 1230,1234 (Fla. 1st DCA 2009).
Applying a Binger analysis here, two reasons compel the conclusion that the admission of the testimony of Dr. Shim under review does not warrant a new trial. First, Dr. Shim’s testimony did not represent a change or reversal of his opinions. Dr. Shim’s testimony that he did not observe any signs of RSD on his physical examination of Mrs. Gillett is not the equivalent of offering an opinion that she did not have RSD. Dr. Shim emphasized during direct examination by defense counsel that he was not offering any opinions about RSD. Plaintiffs’ counsel confirmed this point with Dr. Shim twice on cross-examination.
Second, to the extent that Dr. Shim’s testimony about the absence of clinical signs of RSD can be viewed as a new opinion, plaintiffs’ counsel could not have been prejudiced in his preparation for trial by the testimony. The testimony, which formed a limited part of the direct examination, was nothing more than a recital of Dr. Shim’s findings on his physical examination of Mrs. Gillett. The testimony was consistent with Dr. Shim’s prior report. Moreover, the testimony did not prejudice plaintiffs’ counsel in his preparation for trial. The question of whether Mrs. Gillett had RSD was one of the central issues in the case. Plaintiffs’ counsel was fully prepared to address this issue, and he did. Under these circumstances, Binger and its progeny do not support the grant of a new trial based on Dr. Shim’s testimony. See Spalding, 70 So.3d at 698 (finding no prejudice where the objecting party was prepared to address the claimed “surprise” testimony with his own contrary evidence). In its new-trial order, the trial court failed to consider that Dr. Shim’s testimony could not have prejudiced plaintiffs counsel in his preparation for trial.
A consideration of the other evidence presented at trial on the RSD issue demonstrates the absence of prejudice in another way. In addition to Dr. Shim, five doctors offered testimony at trial reporting negative clinical examinations of Mrs. Gil-lett for RSD. Of these five other doctors, three testified for Mrs. Gillett, and two testified for Mr. Moore. One of Mrs. Gil-lett’s treating physicians even testified that Mrs. Gillett did not have RSD when he saw her. Dr. Linde, Mrs. Gillett’s treating neuropsychologist, described Mrs. Gillett as “an outlier,” i.e., the presentation of her symptoms was “extreme” for an RSD patient. He also testified that Mrs. Gillett scored “off the charts” on the hysteria scale of a standard psychological test. In addition, the defense offered expert opinion testimony from other doctors that Mrs. Gillett did not have RSD. In the absence of Dr. Shim’s testimony about his negative clinical observations, there was ample evidence to support a conclusion by the jury that Mrs. Gillett did not have RSD. The new-trial order does not explain how Dr. Shim’s limited testimony about negative clinical signs for RSD could have affected the verdict under these circumstances. For these reasons, the trial court abused its discretion in granting a new trial based on defense counsel’s examination of Dr. Shim.

*944
C. Leading Questions During the Direct Examination of Dr. Linde.

1. Background. Harold Linde, Psy. D., is Mrs. Gillett’s treating neuropsychologist. Mr. Moore called Dr. Linde as a defense witness. During defense counsel’s direct examination of Dr. Linde, the trial court sustained objections by plaintiffs’ counsel that defense counsel was “leading” or “testifying” fifteen times. We have carefully examined the questions at issue. Although a few of them may have been leading, most were not.
Nevertheless, the trial court eventually warned defense counsel as follows: “We are going down the leading path again. One more time and your questions of [Dr. Linde] are over. All right?” Despite the absence of a further objection, the trial court interrupted defense counsel in the middle of his next question to the witness and terminated the direct examination of Dr. Linde. Then, plaintiffs’ counsel proceeded directly to his cross-examination of the witness. Plaintiffs’ counsel did not make a contemporaneous motion for mistrial based on the ground of leading questions.
2. Analysis. We conclude that defense counsel’s alleged “testifying” by leading questions posed to Dr. Linde will not support the new-trial order for three reasons. First, plaintiffs’ counsel did not make a contemporaneous motion for mistrial based on the purportedly leading questions. Indeed, plaintiffs counsel acquiesced in the remedy chosen by the trial court — the termination of defense counsel’s direct examination of the witness. This was a severe remedy for asking leading questions. And under these circumstances, this issue was unpreserved. See Companioni v. City of Tampa, 51 So.3d 452, 455-56 (Fla.2010); Millar Elevator Serv. Co. v. McGowan, 819 So.2d 145, 153 (Fla. 2d DCA 2002); Bew v. Williams, 373 So.2d 446, 448-49 (Fla. 2d DCA 1979); Dorsey v. Reddy, 931 So.2d 259, 265 (Fla. 5th DCA 2006); Puza v. Winn-Dixie Supermarkets, Inc., 526 So.2d 696, 697 (Fla. 4th DCA 1988).
Second, although the trial court sustained objections to many of defense counsel’s questions to Dr. Linde on the basis that they were “leading” or involved counsel’s “testifying,” the questions posed were generally not leading or otherwise improper. “An objection may be made to a question as leading because it is, in fact, leading or because objecting counsel is attempting to disrupt the smooth flow of testimony.” Murrell v. Edwards, 504 So.2d 35, 36 (Fla. 5th DCA 1987). Here, plaintiffs’ counsel appears to have made the objections for the latter reason, not the former.
Third, even if the questions had been leading and a contemporaneous motion for mistrial had been made, defense counsel’s propounding of leading questions would not warrant a new trial. The Gil-letts have not cited any Florida decision in a civil case that has required a new trial based on objections to leading questions. In fact, the case law suggests that — at least in civil cases — leading questions do not result in an error that will warrant a new trial. See Puza, 526 So.2d at 697 (reversing an order for new trial for the defendant based on the trial court’s conclusion “that the plaintiffs counsel had asked an excessive number of leading questions”); Murrell, 504 So.2d at 36 (“Leading questions are not often analyzed in appellate opinions because they seldom, if ever, are the basis for error on appeal.”).
Here, the trial court viewed defense counsel’s “leading” questions posed to Dr. Linde as only one part of the “totality” of defense counsel’s alleged misconduct before and during the trial. At the hearing *945 on the motion for new trial, the trial court acknowledged that the alleged “leading” questions posed to Dr. Linde were not sufficient — considered in isolation — to warrant granting the plaintiffs a new trial. Undeniably, this ground does not support the new-trial order.

D. “Trial by Ambush” Through the Testimony of Wilhelmina Korevaar, M.D.

1. Background. In the fourth ground, the trial court found that “defense counsel improperly conducted a trial by ambush through the testimony of Defendant’s expert witness, Dr. Wilhelmina Korevaar.” The new-trial order attributes the “ambush” to alleged discovery violations by defense counsel and a failure to conduct a pretrial exhibit exchange as required by court order. In support of the new-trial order, the Gilletts explain that the “ambush” resulted from Dr. Korevaar’s opinion — not disclosed in her report — that Mrs. Gillett had a somatization disorder. We think this ground for the new-trial order actually conflates three separate issues: (1) unspecified discovery violations, (2) the violation of a court order requiring a pretrial exchange of trial exhibits, and (3) the alleged expression by a defense medical expert witness — Dr. Korevaar— of an opinion not disclosed in her report. As in the ground for the new-trial order involving Dr. Shim, we think that a Éinger analysis — not a focus on alleged attorney misconduct — is the appropriate way to analyze the third issue.
Dr. Korevaar is a board-certified anesthesiologist with a subspecialty in pain management. She enjoys a reputation as an expert on RSD, and her office is located in a Philadelphia suburb. Dr. Korevaar conducted an IME of Mrs. Gillett in Tampa on August 20, 2009, more than one year before the trial began. Dr. Korevaar’s report was available shortly thereafter.
For reasons unexplained in our record, plaintiffs’ counsel did not schedule Dr. Ko-revaar’s deposition until a date in August 2010, approximately one month before trial. Plaintiffs’ counsel cancelled that deposition because defense counsel was in trial in another case on the scheduled date. Plaintiffs’ counsel rescheduled the deposition but then cancelled it again for reasons that we need not detail here.
On the morning of Friday, September 17, the fifth day of the trial, plaintiffs’ counsel informed the trial court that he had not yet deposed Dr. Korevaar and requested an opportunity to depose her before she testified. Although defense counsel planned to call Dr. Korevaar to testify that afternoon, the trial court ruled that plaintiffs’ counsel would have an opportunity to depose Dr. Korevaar before she testified. In accordance with the trial court’s ruling, plaintiffs’ counsel deposed Dr. Korevaar that evening.
During her deposition, Dr. Korevaar testified in accordance with her prior report that Mrs. Gillett did not have RSD. However, Dr. Korevaar also explained that a diagnosis of a somatization disorder could reasonably explain Mrs. Gillett’s unusual constellation of symptoms. The latter statement was not included in Dr. Korev-aar’s prior report.
The defense did not call Dr. Korevaar to testify until Thursday, September 23, the ninth day of the trial. Before Dr. Korev-aar took the stand, plaintiffs’ counsel filed a motion in limine seeking to preclude Dr. Korevaar from testifying that Mrs. Gillett had a somatization disorder. Plaintiffs’ counsel argued that the Gilletts would be prejudiced if Dr. Korevaar were allowed to offer this opinion because it was not previously disclosed in her report. Defense counsel responded that plaintiffs’ counsel *946 was not prejudiced because he had already covered the issue of a somatization disorder with Dr. Linde and the question of malingering with two medical doctors. After hearing argument, the trial court granted the motion in limine.
Next, Dr. Korevaar took the stand and testified to her opinion that Mrs. Gillett did not have RSD. Dr. Korevaar honored the trial court’s ruling on the motion in limine and did not mention a somatization disorder. During defense counsel’s direct examination of Dr. Korevaar, he asked her questions about Mrs. Gillett’s documented physical complaints that had no apparent physical cause. These physical complaints were generally inconsistent with a diagnosis of RSD; some of them were consistent with a diagnosis of a somatization disorder. Plaintiffs’ counsel objected several times that defense counsel was leading Dr. Ko-revaar through the signs of a somatization disorder without using the term. The trial court overruled these objections and allowed defense counsel to proceed. With this background, we turn to an analysis of this ground for the new-trial order.
2. Analysis. We will analyze separately the three issues combined in this ground for the new-trial order. On the first issue, we note that the trial court’s finding that defense counsel had committed discovery violations relative to Dr. Korevaar’s testimony is puzzling. Plaintiffs’ counsel acknowledged receiving Dr. Korevaar’s report, and he had a year before the trial to schedule her deposition. To the extent that defense counsel may have been at fault for the inability of plaintiffs’ counsel to take Dr. Korevaar’s deposition before trial, plaintiffs’ counsel received the remedy he sought — the opportunity to take the deposition before Dr. Korevaar testified. Indeed, although Dr. Korevaar resided in Pennsylvania, defense counsel acquiesced in postponing her testimony. Dr. Korevaar did not take the witness stand until six days after her deposition was taken.
On the second issue, the trial court’s reference to the failure to conduct a pretrial exhibit exchange in the context of Dr. Korevaar’s testimony is also puzzling. Granted, one might fault both attorneys for failing to conduct a pretrial exchange of exhibits as required by the trial court’s order. The nature of the case — a two-week trial featuring voluminous medical records and complicated expert witness testimony — makes this omission particularly difficult to understand.[6] Nevertheless, plaintiffs’ counsel had the opportunity to review Dr. Korevaar’s records before she testified on the ninth day of the trial. Moreover, an exhibit exchange would not have revealed Dr. Korevaar’s undisclosed opinion — expressed in her deposition but not at trial — that Mrs. Gillett had a soma-tization disorder. The trial court could have sanctioned counsel for violating the court order requiring a pretrial exchange of exhibits. Nevertheless, the grant of a new trial is not an appropriate sanction for a dereliction by counsel that could not have affected the verdict. See Murphy v. Int’l Robotic Sys., Inc., 766 So.2d 1010, 1029 (Fla.2000); Platz v. Auto Recycling & Repair, Inc., 795 So.2d 1025, 1026 (Fla. 2d DCA 2001).
Thus the first two issues concerning Dr. Korevaar’s testimony do not support the new-trial order because they have no foundation in the record. An analysis of the third issue leads to the conclusion that the trial court abused its discretion in granting a new trial based on a conclusion that Dr. *947 Korevaar’s testimony resulted in a trial by “ambush.” Dr. Korevaar’s trial testimony did not produce any surprises.
As we have already noted, the trial court granted the motion in limine precluding Dr. Korevaar from offering an opinion that Mrs. Gillett had a somatization disorder. Dr. Korevaar scrupulously observed the trial court’s ruling. For this reason, a Binger analysis with regard to Dr. Korevaar’s testimony is arguably unnecessary. Even so, Dr. Korevaar’s testimony about Mrs. Gillett’s physical complaints — some of which were consistent with a somatization disorder — could not have prejudiced plaintiffs’ counsel in his trial preparation. In 2001, Marc A. Reis-kind, M.D., one of Mrs. Gillett’s treating physicians, had diagnosed her with “questionable somatoform disorder.”[7] Somati-zation disorder is one of the recognized somatoform disorders. Dr. Reiskind’s medical records were received in evidence at the trial. Dr. Linde, Mrs. Gillett’s treating neuropsychologist, testified at trial that he had diagnosed Mrs. Gillett with a somatization disorder. John Leaven-good, M.D., who had conducted an IME of Mrs. Gillett, testified that she had a soma-tization disorder. Like the diagnosis of RSD, plaintiffs’ counsel knew that a diagnosis of somatization disorder was an issue in the case long before the trial began, and he was fully prepared to address the issue. Here again, the trial court failed to consider that Dr. Korevaar’s testimony could not have prejudiced plaintiffs’ counsel in his preparation for trial. See Spalding, 70 So.3d at 698 (finding no prejudice where the objecting party was prepared to address the claimed “surprise” testimony with his own contrary evidence). For these reasons, the issues concerning Dr. Korevaar’s testimony do not support the new-trial order.
V. CONCLUSION
In conclusion, none of the grounds stated in the new-trial order which the Gilletts contend rest on preserved error are sufficient to warrant a new trial. Nor are the preliminary findings and the “highlights” stated in the new-trial order considered in their totality, or in any combination of fewer grounds, sufficient to warrant a new trial. To the extent that any of the grounds stated in the new-trial order do not rest on preserved error, we conclude that they are insufficient to constitute fundamental error under the demanding standard of Murphy, 766 So.2d at 1027-31. We have not discussed every argument made by the Gilletts in their answer brief. However, we have considered all of their arguments, and we find them to be insufficient to warrant affirmance of the new-trial order.
Accordingly, we reverse the trial court’s new-trial order. On remand, the trial court shall reinstate the jury’s verdict and *948 enter a final judgment in accordance with it.
Reversed and remanded with directions.
WHATLEY and CRENSHAW, JJ., Concur.

. Mr. Moore's appellate counsel did not represent him in the trial court.

. Mr. Gillett continued to pursue a claim under section 768.0415, Florida Statutes (1999), for the loss of parental consortium on behalf of one of their minor children.

. "Complex regional pain syndrome (CRPS), formerly Begum Syndrome, is a chronic progressive disease characterized by severe pain, swelling and changes in the skin. It often affects an arm or a leg and may spread to another part of the body and is associated with dysregulation of the autonomic nervous system resulting in multiple functional loss, impairment and disability.... The cause of this syndrome is currently unknown. Precipitating factors include injury and surgery, although there are documented cases that have no demonstrable injury to the original site.” Complex regional pain syndrome (Apr. 26, 2012, 7:21 a.m.), http://en.wikipedia.Org/w/ index.php?title=Complex_regional_pain_ syndrome&oldid=489276891

. "Somatization disorder (also Briquet's syndrome or hysteria) is a somatoform disorder characterized by recurring, multiple, clinically significant complaints about pain, gastrointestinal, sexual and pseudoneurological symptoms. Those complaints must begin before the individual turns 30 years of age, and could last for several years, resulting in either treatment seeking behavior or significant treatment. Individuals with somatization disorder typically visit many doctors in pursuit of effective treatment. Somatization disorder also causes challenge and burden on the life of the caregivers or significant others of the patient.” Somatization disorder (Mar. 4, 2012, 7:20 a.m.), http://en.wikipedia.Org/w/ index.php?title=Somatization_disorder& oldid=480107991 (footnotes omitted).

. We have not overlooked the Gilletts' argument in support of the order granting a new trial based on the unpreserved grounds. According to the Gilletts, a consideration of the unpreserved grounds cumulatively with the preserved error entitles her to a new trial “because the level of misconduct exhibited by defense counsel throughout the trial satisfies Murphy [v. Int'l Robotic Sys., Inc., 766 So.2d 1010 (Fla.2000) ].”

. While the trial continued, the trial judge graciously allowed the parties to use a hearing room at the courthouse to review the pertinent documents, including Mrs. Gillett's voluminous medical records.

. "In psychology, a somatoform disorder is a mental disorder characterized by physical symptoms that suggest physical illness or injury — symptoms that cannot be explained fully by a general medical condition, direct effect of a substance, or attributable to another mental disorder (e.g.[,] panic disorder). The symptoms that result from a somatoform disorder are due to mental factors. In people who have a somatoform disorder, medical test results are either normal or do not explain the person’s symptoms. Patients with this disorder often become worried about their health because the doctors are unable to find a cause for their health problems. This causes severe stress, due to preoccupations with the disorder that portrays an exaggerated belief about the severity of the disorder. Symptoms are sometimes similar to those of other illnesses and may last for several years. Usually, the symptoms begin appearing during adolescence, and patients are diagnosed before the age of 30 years.” Somatoform disorder (Apr. 22, 2012, 8:55 p.m.), http://en.wikipedia.org/ w/index.php?title=Somatoform_disorder& oldid=488711043 (footnotes omitted).